Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2020 CO 66**

**No. 18SC817, *Rocky Mountain Gun Owners v. Polis*—Right to Keep and Bear Arms—Colo. Const. art. II, § 13—Large-Capacity Magazines.**

The supreme court reviews whether legislation prohibiting the sale, transfer, or possession of a "large-capacity magazine" violates the right to keep and bear arms protected under article II, section 13 of the Colorado Constitution. Relying on its longstanding test under *Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994), for examining challenges brought under article II, section 13, the court concludes that the legislation is a reasonable exercise of the police power that has neither the purpose nor effect of nullifying the right to bear arms in self-defense. Accordingly, the court affirms the judgment of the court of appeals.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

### 2020 CO 66

---

### Supreme Court Case No. 18SC817
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 17CA1502

---

### Petitioners:

Rocky Mountain Gun Owners, a Colorado nonprofit corporation; National Association for Gun Rights, Inc., a Virginia nonprofit corporation; and John A. Sternberg,

**v.**

### Respondent:

Jared S. Polis, in his official capacity as Governor of the State of Colorado.

---

### Judgment Affirmed
*en banc*
June 29, 2020

---

**Attorneys for Petitioners:**
Arrington Law Office
Barry K. Arrington
    *Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Eric R. Olson, Solicitor General
Stephanie Lindquist Scoville, First Assistant Attorney General
Kathleen L. Spalding, Senior Assistant Attorney General
Grant T. Sullivan, Assistant Solicitor General
    *Denver, Colorado*

**Attorneys for Amicus Curiae Brady Center to Prevent Gun Violence:**
Hogan Lovells US LLP
Lisa J. Fried
Nathaniel H. Nesbitt
Mark D. Gibson
     *Denver, Colorado*

**Attorneys for Amicus Curiae City and County of Denver:**
Kristin M. Bronson, City Attorney
Kristen J. Crawford, Assistant City Attorney
Kristin George, Assistant City Attorney
     *Denver, Colorado*

**Attorneys for Amicus Curiae City of Boulder:**
Thomas A. Carr, City Attorney
     *Boulder, Colorado*

Everytown Law
William J. Taylor, Jr.
     *Denver, Colorado*

**Attorney for Amici Curiae Colorado Law Enforcement Firearms Instructors Association; Sheriffs Shannon Byerly, Todd Combs, Allen Cooper, Garth Crowther, Bill Elder, Thomas Elliott, KC Hume, Matt Lewis, Dave Martin, Anthony Mazzola, Don McDonald, Tom McGraw, Jason Mikesell, Shawn Mobley, Tim Norton, Brett Powell, Steve Reams, Richard Reigenborn, Danny Sanchez, Brent Schroetlin, Casey Sheridan, Aaron Shiplett, Jeff Shrader, Justin Smith, Tony Spurlock, John Stivers, Rick Valdez, James Van Beek, Lou Vallario, Garrett Wiggins, Don Wilson, and Sam Zordel; and the Independence Institute:**
David B. Kopel
     *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Municipal League:**
David W. Broadwell
Laurel Witt
     *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado State Shooting Association:**
Hale Westfall, LLP
Richard A. Westfall
*Denver, Colorado*

**Attorney for Amicus Curiae Firearms Policy Coalition, Firearms Policy Foundation, Second Amendment Foundation, and Millennial Policy Center:**
Joseph Greenlee
*Sacramento, California*

**Attorneys for Amicus Curiae Giffords Law Center to Prevent Gun Violence:**
Morrison & Foerster LLP
Nicole K. Serfoss
Sarah E. Barr
*Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

3

¶1   In recent decades, Colorado has been the setting of two of the nation's most notorious mass shootings: Columbine High School in 1999 and the Aurora movie theater in 2012. In both attacks, the shooters used large-capacity ammunition magazines. Collectively, the shooters killed over two dozen people and wounded scores more.

¶2   In response to these shootings, the Colorado General Assembly passed House Bill 13-1224 ("HB 1224"), which limits the capacity of magazines acquired after July 1, 2013. Relevant here, HB 1224 generally prohibits the sale, transfer, or possession of any "large-capacity magazine," defined to include "[a] fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, *or that is designed to be readily converted to accept*, more than fifteen rounds of ammunition." § 18-12-301(2)(a)(I), C.R.S. (2019) (emphasis added).

¶3   Rocky Mountain Gun Owners (a Colorado nonprofit organization), the National Association for Gun Rights (a Virginia nonprofit organization), and John A. Sternberg (collectively, "Plaintiffs") challenge this law as an infringement on the right to bear arms—not under the Second Amendment to the U.S. Constitution, but under article II, section 13 of the Colorado Constitution. Plaintiffs construe HB 1224's definition of "large-capacity magazine" to encompass all magazines with removable base pads because such magazines can be "readily converted to accept[] more than fifteen rounds of ammunition." § 18-12-301(2)(a)(I). They argue that HB 1224 therefore operates to ban practically all detachable magazines,

4

violating Coloradans' state constitutional right to bear arms in defense of home, person, and property.

¶4    We disagree.  We conclude that Plaintiffs' interpretation of the definition of "large-capacity magazine" is inconsistent with the provision's plain text because it ignores the narrowing language, "*designed to be* readily converted to accept[] more than fifteen rounds of ammunition."  § 18-12-301(2)(a)(I) (emphasis added). Relying on our longstanding test under *Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994), for examining challenges brought under article II, section 13 of the Colorado Constitution, we hold that Plaintiffs failed to prove beyond a reasonable doubt that HB 1224 violates the state constitutional right to bear arms.  Accordingly, we affirm the judgment of the court of appeals.

¶5    We emphasize that the Second Amendment applies with full force in Colorado and our legislature may not enact any law in contravention of it.  But Plaintiffs have challenged HB 1224 only under the Colorado Constitution. Reviewing that claim, we conclude today that the legislation passes state constitutional muster.  Because Plaintiffs do not challenge HB 1224 under the Second Amendment, we do not address whether the legislation runs afoul of the federal constitution.  That separate question is simply not before us.[1]

---

[1] We granted certiorari to review the following issues:

## I.  Facts and Procedural History

### A.  HB 1224

¶6    In 2013, the Governor signed HB 1224 into law.  As relevant here, that legislation added two provisions to the criminal code regulating large-capacity magazines ("LCMs").  Section 18-12-301(2)(a)(I) defines a "large-capacity magazine" to include any "fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, *or that is designed to be readily converted to accept*, more than fifteen rounds of ammunition."  (Emphasis added.)  Section 18-12-302, C.R.S. (2019), criminalizes the sale, transfer, or possession of LCMs, with certain exceptions.[2]

1. Whether this court should address and resolve the conflict between *Students for Concealed Carry on Campus, LLC v. Regents of the University of Colorado*, 280 P.3d 18 (Colo. App. 2010), and *Trinen v. City & County of Denver*, 53 P.3d 754 (Colo. App. 2002), surrounding the meaning of the "reasonableness" standard of review established in *Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994).

2. Whether the court of appeals erred in applying the *Robertson* reasonableness standard after the United States Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

3. Whether the court of appeals' interpretation of HB 1224 was contrary to the plain meaning and purpose of the statute.

4. Whether HB 1224 violates the right to bear arms as set forth in article II, section 13 of the Colorado Constitution.

[2] Section 18-12-302 permits possession by a person who owned an LCM on July 1, 2013 and has maintained continuous possession of it, § 18-12-302(2)(a), and it

## B. Plaintiffs' Complaint

¶7 Plaintiffs challenged HB 1224 under article II, section 13 of the Colorado Constitution, which addresses the right to keep and bear arms:

> The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

Colo. Const. art. II, § 13. In their complaint, Plaintiffs alleged that the LCM prohibition violates the right to keep and bear arms in defense of home, person, and property.[3] In particular, Plaintiffs alleged that "[t]he magazines for most handguns, for many rifles, and for some shotguns are detachable box magazines," the "very large majority" of which contain a removable floor plate, or base pad.[4]

---

permits possession by manufacturers, employees, and sellers meeting certain criteria, § 18-12-302(3).

[3] Amici Curiae Colorado Law Enforcement Firearms Instructors Association et al. argue that HB 1224 also burdens the article II, section 13 right "to keep and bear arms . . . in aid of the civil power when thereto legally summoned." Because Plaintiffs did not address this theory in their complaint, on appeal, or in their briefing to this court, we do not review it.

[4] A floor plate, or base pad, is essentially the bottom end of a magazine that keeps its components in place. Inside the magazine, a spring-loaded follower rests against the base pad to hold the ammunition under pressure such that cartridges are fed into the gun's chamber at the other end. Although magazines historically were made with fixed metal baseplates, at the time of trial, over 90% of detachable magazines were manufactured with removable pads.

According to Plaintiffs, a removable base pad "allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine." But importantly for purposes of their constitutional challenge, Plaintiffs alleged that a removable base pad also "inherently creates the possibility" for a magazine to be extended through commercially available or readily fabricated parts, such that nearly every magazine can be "readily converted to accept[] more than fifteen rounds of ammunition" in violation of section 18-12-301(2)(a)(I). In short, Plaintiffs complained that because the "designed to be readily converted" clause in section 18-12-301(2)(a)(I) arguably encompasses any magazine with a removable base pad, it effectively bans most functional firearms and thus violates Coloradans' right to keep and bear arms under the state constitution.

### C. Initial Dismissal of Plaintiffs' Complaint

¶8 The trial court granted the Governor's motion to dismiss Plaintiffs' claim, relying on this court's decision in *Robertson v. City & County of Denver*. *Robertson* addressed a challenge to a Denver ordinance that banned the manufacture, sale, or possession of assault weapons. 874 P.2d at 326. The district court in that case concluded that the right to bear arms under article II, section 13 is a fundamental right. *Id.* at 327. It therefore reviewed the ordinance under strict scrutiny, asking whether the ban was supported by a compelling government interest and whether it was narrowly tailored to meet that interest. *Id.* at 331.

¶9 This court reversed and instead applied a "reasonable exercise" test to Denver's assault weapon ban. *Id.* Specifically, we held that "the state may regulate the exercise of [the article II, section 13 right] under its inherent police power so long as the exercise of that power is reasonable," *id.* at 328, and that an act is within the state's police power "if it is reasonably related to a legitimate governmental interest such as the public health, safety, or welfare," *id.* at 331. We concluded that because Denver's ordinance served a legitimate interest of improving public safety and banned only a narrow class of weapons, the law was a reasonable exercise of the state's police power. *Id.* at 333.

¶10 Here, applying the reasonable exercise test from *Robertson*, the trial court held that, even accepting the facts alleged in their complaint as true, Plaintiffs failed to state a claim that HB 1224 was not a reasonable exercise of the state's police power. The trial court rejected Plaintiffs' reading of the statutory definition of an LCM, reasoning that "a magazine that is *designed to be* readily converted is not the same as one with *a design that is subject to being* readily converted." The court explained that "[t]he fact that extensions may be bought or built which take advantage of the removable floor plate to extend the magazine capacity does not alter [the] purpose for which the floor plate was designed." That purpose, even according to the complaint, was to allow users to clear ammunition jams and perform maintenance and cleaning. The trial court thus concluded that Plaintiffs' central allegation rested on a misreading of the plain language of HB 1224.

## D. *RMGO I*

¶11  The court of appeals reversed the trial court's order dismissing the complaint. *Rocky Mountain Gun Owners v. Hickenlooper*, 2016 COA 45M, 371 P.3d 768 ("*RMGO I*").  In a 2-1 ruling, the division rejected Plaintiffs' chief argument on appeal: that the U.S. Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), effectively overruled *Robertson* by establishing that the right to bear arms under the Second Amendment to the U.S. Constitution is "fundamental" and that restrictions on the right are therefore subject to heightened scrutiny.[5]  *RMGO I*, ¶¶ 16-22, 371 P.3d at 772–74.  The division majority reasoned that Plaintiffs did not challenge HB 1224 under the Second Amendment, but instead under the Colorado Constitution, "the construction and application of which are matters peculiarly within the province of the Colorado Supreme Court to determine."  *Id.* at ¶ 20, 371 P.3d at 773–74.

¶12  The division also disagreed with Plaintiffs' premise that, by adopting the reasonable exercise test, *Robertson* implicitly held the right to bear arms under article II, section 13 is *not* fundamental.  *Id.* at ¶ 18, 371 P.3d at 772.  On this point, it disagreed with the division in *Trinen v. City & County of Denver*, 53 P.3d 754

---

[5] In dissent on this point, Judge Graham agreed with Plaintiffs that after *Heller* and *McDonald*, restrictions on the article II, section 13 right can no longer be evaluated under a reasonableness test.  *RMGO I*, ¶¶ 49–69, 371 P.3d at 779–82.

(Colo. App. 2002), and explained its view that *Trinen*'s reading of *Robertson* was "based on the misperception that *Robertson*'s 'reasonable exercise of the police power' test was 'essentially' the same as the 'rational basis test.'" *RMGO I*, ¶ 18 n.3, 371 P.3d at 772 n.3 (quoting *Trinen*, 53 P.3d at 757–58). The division agreed instead with the analysis in *Students for Concealed Carry on Campus, LLC v. Regents of the University of Colorado*, 280 P.3d 18 (Colo. App. 2010), *see RMGO I*, ¶ 18 n.3, 371 P.3d at 772 n.3, which concluded that the reasonable exercise test is distinguishable from rational basis review and that *Robertson* expressly declined to address whether the article II, section 13 right is fundamental, *Students for Concealed Carry*, 280 P.3d at 26–29.

¶13 Having concluded that *Robertson* provided the applicable framework, the division determined that because the reasonable exercise test presents a mixed question of law and fact, the trial court erred in dismissing Plaintiffs' claim without a factual inquiry into the reasonableness of the limits set by HB 1224. *RMGO I*, ¶¶ 23–31, 371 P.3d at 774–75. It therefore reversed the trial court's judgment and remanded the case to give Plaintiffs an opportunity to test their allegations "through the crucible of factfinding." *Id.* at ¶¶ 29, 48, 371 P.3d at 775, 778.

### E. Bench Trial

¶14 A week-long bench trial followed. The court heard testimony from both sides' experts in constitutional history; Plaintiffs' experts in statistical analysis and the design and operation of firearms and their components; and the Governor's

11

experts in public health and violence prevention, security policy and mass shootings, and economics and econometric analysis. It also heard testimony from former law enforcement officers and witnesses to mass shootings.

¶15 In a detailed written order, the court concluded that Plaintiffs did not meet their burden to prove HB 1224 unconstitutional under *Robertson*. First, the court made findings concerning the relationship between LCMs and the prevalence and lethality of mass shootings. These included that the number and fatality rate of mass shootings in the country had surged in the preceding decade; that use of LCMs in mass shootings dramatically increases the number of victims shot, results in victims being struck by more bullets, and increases the fatality rate of struck victims; and that LCMs have been used in the most horrific mass shootings in recent history, including Columbine High School in 1999 and the Aurora movie theater in 2012.

¶16 Next, based on testimony from a security policy expert and a witness who tackled a gunman during a shooting in Arizona, the trial court found that one of the most important dynamics in ending a mass shooting and reducing casualties is the pause created by the shooter's need to stop and reload or replace a magazine. Such pauses give victims an opportunity to take life-saving measures like hiding, running, or attacking the shooter. Ultimately, the court found that the greater the capacity of the magazines used, the greater the number of people hurt. By

contrast, the lower the capacity of the magazines used, the sooner opportunities are created to allow people to take potential life-saving measures.

¶17 On the other side of the equation, the court found that the ability to fire more than fifteen rounds without replacing a magazine is not required for purposes of legitimate self-defense. It observed that persons defending themselves, their homes, or their property do not seek to kill as many people as they can; instead, they need only to cause an intruder or assailant to flee. Indeed, the court noted that the testimony of law enforcement officers with decades of experience in urban and rural jurisdictions identified no examples of individuals firing more than two to three shots in self-defense.

¶18 Looking to the legislative history of HB 1224, the trial court concluded there was "no question" that its specific purpose was "to reduce the number of people who are killed or shot in mass shootings," as opposed to reducing overall gun violence or gun deaths. It therefore rejected as irrelevant Plaintiffs' evidence regarding the ineffectiveness of LCM prohibitions in reducing general murder rates, gun homicide rates, or gun crime rates. Ultimately, the court concluded that HB 1224 sought to address a "specific and valid governmental concern regarding the health, safety, and welfare" of Coloradans, namely, reducing "the number of victims in mass shootings by limiting the number of rounds that can be fired before a shooter has to reload."

¶19 The evidence presented at trial further persuaded the court that the fifteen-round limit was not only based on a "valid, reasonable, safety concern," but is reasonable and "does not impose on the constitutionally protected right to keep and bear arms for self-defense or defense of home or property." The court noted that in fact, during the legislative process, the General Assembly *raised* the limit from ten rounds (as initially proposed) to fifteen rounds as a compromise "to increase the capacity of firearms used for defensive purposes."

¶20 In concluding that HB 1224 was a reasonable exercise of the state's police power, the trial court again rejected Plaintiffs' position that the statutory language, "designed to be readily converted," encompasses the 90% of detachable magazines manufactured with a removable base pad. It acknowledged that Plaintiffs' expert had demonstrated the ease with which various magazines with removable base pads can be converted to accept more ammunition in a matter of seconds using simple tools. But the court doubted the credibility of the expert's suggestion that the removable base pads were designed with the intent to increase magazine capacity. Instead, the weight of evidence indicated that the purpose of removable base pads is to "facilitate cleaning, maintenance, and repair." The court concluded that "while the nature of removable base pads make[s] it *possible* to increase the capacity of a magazine, they were not specifically *designed* to be so modified." (Emphases added.)

14

¶21 Finally, considering expert testimony from both sides regarding Colorado constitutional history, the court ruled there was no historical basis to conclude that the framers of article II, section 13 intended to preclude the type of regulation imposed by HB 1224. The court observed that the mythology of nineteenth-century Colorado as a "lawless frontier" is "simply a false narrative created by dime novels and Hollywood westerns," and that instead, the people who migrated to the West largely believed that liberty without law was anarchy. It found no indication in the language of the Colorado Constitution suggesting that the framers desired to create protections for the right to bear arms that were exceptional or unique for the time. Rather, Colorado's provision, including its limitation with respect to the carrying of concealed weapons, drew from a similar provision in Missouri's constitution. The court noted that once Colorado became a state, regulation of firearms at the state and local level was common. Indeed, some towns had firearm regulations that were among the most restrictive in the country at the time. The court observed that although there were no restrictions on magazine capacity in the late 1800s, the modern phenomenon of mass shootings using weaponry that can fire dozens or hundreds of rounds without reloading "would not even have been imagined when Colorado became a state."

¶22 The court rejected Plaintiffs' contention that restrictions on the right to bear arms under article II, section 13 must be subject to a more stringent test than that articulated in *Robertson*. It nevertheless proceeded to evaluate HB 1224 under

15

intermediate scrutiny to avoid the need for a remand in the event of a reversal on appeal. Even under this standard, however, the court concluded that HB 1224 is constitutional because "the effort to restrict LCMs is directly and substantially related to the fundamentally important governmental interest of protecting and preserving lives." The court entered judgment for the Governor.

## F. *RMGO II*

¶23 Plaintiffs appealed again. This time, the court of appeals unanimously affirmed the trial court's judgment. *Rocky Mountain Gun Owners v. Hickenlooper*, 2018 COA 149, ¶ 1, __ P.3d __ ("*RMGO II*"). First, the division rejected Plaintiffs' contention that HB 1224 must be subject to a heightened standard of review. *Id.* at ¶¶ 17–18 (explaining that the division was neither at liberty to depart from this court's precedent in *Robertson* nor inclined to depart from the law of the case set forth in *RMGO I*).[6]

¶24 Reviewing Plaintiffs' claim under *Robertson*, the division deferred to the trial court's factual finding that the purpose of HB 1224 was to reduce the number of people killed or shot in mass shootings. *RMGO II*, ¶ 19. The division concluded

---

[6] The division also rejected the suggestion implicit in Plaintiffs' proposed analytical framework that the constitutionality of HB 1224 should be examined in light of the historical context of article II, section 13. *See id.* at ¶ 42.

that this purpose furthers a legitimate governmental interest in public health and safety. *Id.* at ¶ 20.

¶25 Next, the division concluded that ample record evidence supported the trial court's findings that the LCM prohibition is reasonably related to the purpose of the legislation:

> Because the incidence of mass shootings with LCMs is on the rise; the only mass shootings in Colorado over the last fifty years involved LCMs (and resulted in deaths of twenty-five people); and smaller magazines create more pauses in firing, which allow potential victims to take life-saving measures, we conclude that the statutes are reasonably related to the legitimate governmental purpose of reducing deaths from mass shootings.

*Id.* at ¶ 25. In response to Plaintiffs' contention that LCM restrictions have not been shown to reduce overall gun violence or deaths from use of guns, the court of appeals explained that "[l]egislation need not solve all gun problems to be constitutional." *Id.* at ¶ 26 (citing *Parrish v. Lamm*, 758 P.2d 1356, 1371 (Colo. 1988)).

¶26 The division also rejected Plaintiffs' argument that the trial court erred in construing the "designed to be readily converted" provision not to include all magazines with removable base pads. *Id.* at ¶¶ 27–33. The division reasoned that the dictionary defines "designed" to mean "done, performed, or made with purpose and intent." *Id.* at ¶ 31 (quoting *Designed*, Webster's Third New International Dictionary 612 (2002)). And it found record support for the trial court's conclusion that magazines with removable base pads were not designed with the intent to be converted to LCMs. *Id.* at ¶ 30. Thus, the division concluded

17

that under the statute's plain language, the General Assembly did not intend to regulate all magazines with removable floor plates. *Id.* at ¶ 32. The division added that even if the statutory language were ambiguous, the legislative history of the bill and the doctrine of constitutional doubt would resolve any question against Plaintiffs' interpretation. *Id.* at ¶ 33.

¶27 The division further agreed with the trial court that limiting magazines to fifteen rounds "burden[s] only a person's opportunity to use an LCM, not a person's right to bear arms in self-defense." *Id.* at ¶ 35. It highlighted the parties' stipulation to the mass availability of magazines that hold fifteen or fewer rounds and of guns compatible with such magazines, *id.*; the trial court's finding, supported by the record, that people almost never fire weapons in self-defense using more than two or three bullets, *id.* at ¶ 34; and Plaintiffs' failure to present *any* evidence at trial that "any person in Colorado has ever fired even close to fifteen rounds in self-defense," *id.* at ¶ 36.

¶28 In sum, the court of appeals concluded that HB 1224 was a reasonable exercise of police power and that its definition of LCMs neither forbids the use of magazines simply because they have detachable base pads nor unreasonably burdens the right to self-defense. *Id.* at ¶ 37.

¶29 We granted Plaintiffs' petition for a writ of certiorari to determine whether HB 1224 runs afoul of article II, section 13 of the Colorado Constitution.

18

## II. Standard of Review

¶30 In reviewing a lower court's judgment on the constitutionality of a statute, we review conclusions of law de novo but defer to findings of fact unless clearly erroneous. *See Town of Dillon v. Yacht Club Condos. Home Owners Ass'n*, 2014 CO 37, ¶ 22, 325 P.3d 1032, 1038 (considering constitutionality of municipal ordinance). Statutes are entitled to a presumption of constitutionality, rooted in the doctrine of separation of powers, through which "the judiciary respects the roles of the legislature and the executive in the enactment of laws." *City of Greenwood Vill. v. Petitioners for the Proposed City of Centennial*, 3 P.3d 427, 440 (Colo. 2000). Because "declaring a statute unconstitutional is one of the gravest duties impressed upon the courts," *People v. Graves*, 2016 CO 15, ¶ 9, 368 P.3d 317, 322 (quoting *City of Greenwood Vill.*, 3 P.3d at 440), this presumption of constitutionality can be overcome only if it is shown that the enactment is unconstitutional beyond a reasonable doubt, *Colo. Union of Taxpayers Found. v. City of Aspen*, 2018 CO 36, ¶ 13, 418 P.3d 506, 511; *Mosgrove v. Town of Fed. Heights*, 543 P.2d 715, 717 (Colo. 1975).

## III. Analysis

¶31 To begin, because Plaintiffs challenge HB 1224 solely under article II, section 13 of the Colorado Constitution, we limit our consideration to that provision and reject the contention that U.S. Supreme Court decisions interpreting the Second Amendment to the U.S. Constitution control our analysis. Next, we

19

reaffirm the reasonable exercise test articulated in *Robertson* for reviewing challenges brought under article II, section 13 and clarify how that test differs from ordinary rational basis review. In so doing, we disapprove of the analysis of the court of appeals in *Trinen v. City & County of Denver*. We hold that article II, section 13 stands as an independent, substantive limitation on otherwise rational government action. Finally, applying *Robertson*, we conclude that Plaintiffs failed to prove that HB 1224 is an unreasonable exercise of the police power or that it has an improper purpose or effect of nullifying the right to bear arms in defense of home, person, or property. Plaintiffs' core argument is that HB 1224's definition of LCMs operates unreasonably to ban the vast majority of detachable magazines. But because Plaintiffs' overly broad reading of the statutory definition is contrary to its plain language, we reject their contention that HB 1224's definition of LCMs encompasses all magazines with removable base pads. Because Plaintiffs' constitutional challenge rests on this misreading of the statutory language, it fails. Accordingly, we affirm the judgment of the court of appeals.

### A. *Heller* and *McDonald* Do Not Bind This Court with Respect to the Meaning of Article II, Section 13.

¶32 In 2008, the U.S. Supreme Court held in *District of Columbia v. Heller* that the Second Amendment to the U.S. Constitution protects a limited "individual right to keep and bear arms." 554 U.S. at 595. Two years later, in *McDonald v. City of Chicago*, the Supreme Court held that the Second Amendment is fully applicable

against the states through the Fourteenth Amendment. 561 U.S. at 791. In so holding, the *McDonald* Court concluded that the Second Amendment right identified in *Heller* is "among those fundamental rights necessary to our system of ordered liberty." *McDonald,* 561 U.S. at 778.

¶33 Plaintiffs argue that article II, section 13 of the Colorado Constitution should be interpreted in terms of its own text and history and that the right it guards is broader than the one encompassed by the Second Amendment to the U.S. Constitution. Plaintiffs further contend that because *McDonald* deemed the Second Amendment right fundamental, we must abandon *Robertson* (and, they suggest, adopt a "common lawful use" test purportedly derived from *Heller* in its place).[7] In other words, Plaintiffs argue that, though we are free to interpret Colorado's constitution to be *more* protective of the right to bear arms than the Second Amendment, the U.S. Supreme Court's interpretation of the federal provision sets the constitutional "floor" for our interpretation of article II, section 13.

---

[7] To our knowledge, only a single federal district court has endorsed the "common lawful use" test. *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019), *appeal docketed*, No. 19-55376 (9th Cir. Apr. 4, 2019). The court described the test as "a hardware test" that asks, "Is the firearm hardware commonly owned? Is the hardware commonly owned by law-abiding citizens? Is the hardware owned by those citizens for lawful purposes? If the answers are 'yes,' the test is over. The hardware is protected." *Id.* at 1142. The case is pending on appeal.

¶34    We agree with Plaintiffs' starting premise that article II, section 13 has a text and constitutional tradition distinct from the Second Amendment's. But precisely for this reason, we reject Plaintiffs' contention that our state constitutional provision must be interpreted in lockstep with its federal counterpart. To the contrary, the U.S. Supreme Court has long recognized that state courts are free to interpret their own state constitutions as they wish. *See Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions."); *Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge*, 36 U.S. 420, 510 (1837) ("The laws and constitutions of the states belong solely to the state courts to expound."). Thus, "[t]his court is the final arbiter of the meaning of the Colorado Constitution." *Curious Theatre Co. v. Colo. Dep't of Pub. Health & Env't*, 220 P.3d 544, 551 (Colo. 2009); *see also People v. Dist. Court*, 834 P.2d 181, 193 (Colo. 1992) ("We recognize our freedom to interpret our state constitutional provisions in a manner different than the United States Supreme Court's interpretations of similar provisions in the United States Constitution."). Indeed, we have a responsibility to engage in an independent analysis of our own state constitutional provision in resolving a state constitutional question. *See People v. Young*, 814 P.2d 834, 842 (Colo. 1991).

¶35    To be sure, the U.S. Constitution sets a federal floor of protection *available to* those who allege state infringement of their individual liberties. As such, Plaintiffs were entitled to invoke the protection afforded by the Second Amendment. But

22

they chose not to. Instead, they proceeded under article II, section 13, the distinctive text of a separate sovereign, with meaning independent of the federal provision. *See* Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 174 (2018) ("There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed in the same way."). Accordingly, because *Heller* and *McDonald* construe the U.S. Constitution and not our differently worded state constitutional provision, they do not control the analysis in this case. *See State v. Jorgenson*, 312 P.3d 960, 964 (Wash. 2013) (reading the right to bear arms provision in Washington's state constitution independently of *Heller* and *McDonald*); *State v. Whitaker*, 689 S.E.2d 395, 401 (N.C. Ct. App. 2009) ("[W]e are not bound by decisions of the United States Supreme Court as to construction of North Carolina's constitution" with respect to the right to bear arms.).

¶36 Of course, that our test under article II, section 13 may be different does not mean it is less protective of the state constitutional right. In any case, our independent interpretation of Colorado's constitutional provision does not somehow lower the *federal* constitutional floor. When interpreting our own constitution, we do not stand on the federal floor; we are in our own house.

¶37 We acknowledge that in some contexts, we have borrowed from federal analysis of the U.S. Constitution in construing our own constitutional text,

23

particularly where a party has asserted dual constitutional claims under both a federal provision and its Colorado counterpart. We have leaned on federal analysis primarily where the text of the two provisions is identical or substantially similar, *see, e.g.*, *Young*, 814 P.2d at 845 ("Although [U.S. Supreme Court] cases cannot control our decision because the issue before us is one of Colorado constitutional law, we are attentive to the Supreme Court's reasoning, especially because the text of the cruel and unusual punishments clauses in the two constitutions are the same."), and where consistency between federal and state law has been a goal of our own precedent, *see, e.g.*, *Nicholls v. People*, 2017 CO 71, ¶ 19, 396 P.3d 675, 679 (looking to federal Confrontation Clause analysis for guidance in interpreting Colorado's Confrontation Clause where our decisions "evidence[d] a reasoned attempt to 'maintain consistency between Colorado law and federal law'" in that area (quoting *Compan v. People*, 121 P.3d 876, 886 (Colo. 2005))). That said, even parallel text does not mandate parallel interpretation. *See, e.g.*, *People v. McKnight*, 2019 CO 36, ¶¶ 38–43, 446 P.3d 397, 406–08 (departing from Fourth Amendment jurisprudence to determine a dog sniff was a search under article II, section 7 of the Colorado Constitution where distinctive state-specific factors overcame the provisions' substantially similar wording).

¶38    We have also tended to follow federal jurisprudence where, based on our independent analysis, we find the U.S. Supreme Court's reasoning to be sound, *see, e.g.*, *Nicholls*, ¶ 32, 396 P.3d at 681–82 (following new development in federal

24

Confrontation Clause jurisprudence because "the Supreme Court's reasoning . . . is sound"), and where no party has argued that the Colorado provision calls for a distinct analysis, *see, e.g.*, *Garner v. People*, 2019 CO 19, ¶ 67 n.8, 436 P.3d 1107, 1120 n.8 ("We do not separately analyze our state constitutional due process guarantee because [defendant] has not argued that it should be interpreted any more broadly than its federal counterpart."), *cert. denied*, 140 S. Ct. 448 (2019).

¶39　None of these considerations is present here. First, as masters of their complaint, Plaintiffs did not bring dual constitutional claims but instead elected to challenge HB 1224 solely under the Colorado Constitution. Had Plaintiffs wished to have their allegations judged under *Heller* or *McDonald*, they could have raised a claim under the Second Amendment.[8] But they chose to challenge HB 1224 solely on state constitutional grounds. Having done so, Plaintiffs cannot now insist that federal constitutional law controls the analysis of their case.

¶40　Second, article II, section 13 does not mirror the language of the Second Amendment. The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear

---

[8] Had Plaintiffs brought a Second Amendment claim, we would, of course, be bound by the U.S. Supreme Court's interpretation of that provision. But that is because we would be enforcing a right guaranteed under the federal constitution, not a right under our state constitution. *RMGO I*, ¶ 20 n.5, 371 P.3d at 774 n.5.

Arms, shall not be infringed." U.S. Const. amend. II. The text of article II, section 13 differs in several respects:

> The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

Colo. Const. art. II, § 13.

¶41 Of particular relevance here, article II, section 13 confers a limited, individual right to bear arms "in defense of . . . home, person and property." *E.g.*, *People v. Blue*, 544 P.2d 385, 391 (Colo. 1975) ("We do not read the Colorado Constitution as granting an absolute right to bear arms under all situations. It has limiting language dealing with defense of home, person, and property.").

¶42 Reflecting the significant textual differences between the two provisions, our precedent construing article II, section 13 long ago charted a different course from case law interpreting the Second Amendment.

¶43 In *People v. Nakamura*, 62 P.2d 246 (Colo. 1936), we construed article II, section 13 to provide a "personal right . . . to bear arms in defense of home, person, and property" rather than merely "one of collective enjoyment for common defense," *see id.* at 246–47; *see also Robertson*, 874 P.2d at 327 n.6. At that time,

consensus reflected a different view regarding the scope and meaning of the Second Amendment.[9]

¶44    We also held in *Nakamura* that the right to bear arms in self-defense under article II, section 13 extended to "unnaturalized foreign-born residents," 62 P.2d at 247, a question still the subject of debate in the federal arena today, *see United States v. Torres*, 911 F.3d 1253, 1259–61 (9th Cir. 2019) (describing circuit split over whether the right to bear arms under the Second Amendment applies to undocumented immigrants). And our early decisions examining the felon-in-possession statute against article II, section 13 clearly proceeded from the premise that our constitutional provision protects persons convicted of felonies, *see*

---

[9] *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 178 (1939) ("In the absence of any evidence tending to show that possession or use of a [short-barrel shotgun] . . . has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."); *Fife v. State*, 31 Ark. 455, 458 (1876) ("It is manifest from the language of the [Second Amendment] . . . that the arms which it guarantees American citizens the right to keep and to bear, are such as are needful to, and ordinarily used by a well regulated militia . . . ."); *City of Salina v. Blaksley*, 83 P. 619, 620 (Kan. 1905) ("That the [state constitutional] provision in question applies only to the right to bear arms as a member of the state militia, or some other military organization provided for by law, is also apparent from the second amendment to the federal Constitution . . . ."); *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891) ("The keeping and bearing of arms, . . . which at the date of the [Second Amendment] was intended to be protected as a popular right, . . . refer[s] to the weapons of warfare to be used by the militia . . . .").

*People v. Ford*, 568 P.2d 26, 28 (Colo. 1977); *Blue*, 544 P.2d at 390,[10] a conclusion that stands in contrast to some federal courts' pronouncements regarding the Second Amendment, *see, e.g.*, *Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ."); *United States v. Small*, 494 Fed. App'x 789, 791 (9th Cir. 2012) ("The Second Amendment . . . does not extend to 'felons' . . . ." (quoting *Heller*, 554 U.S. at 626)).

¶45    The point is that we have consistently determined the scope of our provision based on an independent analysis of the Colorado Constitution, rather than by reference to the meaning of its federal counterpart. Not a single one of our opinions construing article II, section 13 looked to interpretations of the Second Amendment right. Certainly our reasoning in these cases has never suggested that our interpretation of article II, section 13 must lock in on the moving target of federal jurisprudence.

¶46    Third, we note that neither *Heller* nor *McDonald* mandated a particular test even for Second Amendment challenges under the U.S. Constitution. *Heller*,

---

[10] More recently in *People v. Carbajal*, 2014 CO 60, 328 P.3d 104, we clarified the narrow scope of this protection, concluding the legislature properly accommodated article II, section 13 by permitting a defendant to raise a choice-of-evils affirmative defense to a felon-in-possession charge. *Id.* at ¶¶ 20–21, 328 P.3d at 109.

554 U.S. at 634 (acknowledging dissent's criticism that the majority opinion "declin[ed] to establish a level of scrutiny for evaluating Second Amendment restrictions"); *see also McDonald*, 561 U.S. at 790–91 (plurality opinion) (noting the *Heller* Court's earlier rejection of Justice Breyer's proposed interest-balancing test, but not setting forth an alternative standard).  To the extent lower federal courts have crafted various tests for Second Amendment challenges in the absence of further guidance from the U.S. Supreme Court,[11] we are not bound by those approaches when considering our own constitutional provision.

¶47     Finally, this is clearly not a case where the parties have agreed that the relevant state constitutional provision should be treated as equivalent to its federal counterpart.  Instead, the daylight between the two constitutional guarantees has been a core disagreement in this litigation.

¶48     For all these reasons, we reject Plaintiffs' contention that *Heller* and *McDonald* bind this court with respect to the meaning of the right to bear arms under article II, section 13.

---

[11] Most courts have adopted a two-pronged test that asks (1) whether the legislation burdens conduct that the Second Amendment protects and (2) if so, what level of scrutiny it warrants.  *See Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018) (collecting cases).

## B. *Robertson* and the Reasonable Exercise Test

### 1. *Robertson* Did Not Decide the Status of the Article II, Section 13 Right.

¶49 Like the present case, *Robertson* involved a constitutional challenge brought solely under article II, section 13 of the Colorado Constitution. *See* 874 P.2d at 326 & n.1. As previously noted, *Robertson* concerned a Denver ordinance banning the manufacture, sale, or possession of assault weapons. *Id.* We granted review of the trial court's holding that the ordinance was unconstitutional and its conclusion that article II, section 13 establishes a fundamental right to bear arms in defense of person, home, and property. *Id.* at 327 & n.5.

¶50 Reviewing our case law construing the provision, we observed that we had "never found it necessary to decide the status accorded [the article II, section 13 right]." *Id.* at 328. Instead, we had "consistently concluded that the state may regulate the exercise of that right under its inherent police power so long as the exercise of that power is reasonable." *Id.* We therefore held conclusively in *Robertson* that it was unnecessary to reach whether the right is fundamental:

> when confronted with a challenge to the validity of a statute or ordinance regulating the exercise of the right to bear arms guaranteed under article II, section 13 of the Colorado Constitution, a reviewing court need not determine the status of that right. Rather, the question in each case is whether the law at issue constitutes a reasonable exercise of the state's police power.

*Id.* at 329. Indeed, we remarked that the trial court's error in reaching the question of the status to be accorded the article II, section 13 right was "contrary to the entire body of precedent of this court." *Id.* at 330–31.

¶51 Given these clear pronouncements, we now expressly disapprove of the *Trinen* division's conclusion that in *Robertson* we "implicitly found that the right to bear arms is not a fundamental right." *Trinen*, 53 P.3d at 757. Rather, we effectively rejected the importation of federal tiers of scrutiny into our article II, section 13 jurisprudence. As the division in *RMGO I* correctly understood, we reasoned that whether the right under article II, section 13 is fundamental or not, a restriction on that right is nonetheless subject to review under a reasonable exercise of police power test. *RMGO I*, ¶ 18, 371 P.3d at 772 (citing *Robertson*, 874 P.2d at 329).

¶52 Because we agree with the *RMGO I* division that the *Trinen* division misperceived our decision in *Robertson* as having "essentially" applied the "rational basis test" to the Denver ordinance, *RMGO I*, ¶ 18 n.3, 371 P.3d at 772 n.3 (quoting *Trinen*, 53 P.3d at 757), we take this opportunity to clarify the distinction between the reasonable exercise test and rational basis review.

### 2. The Reasonable Exercise Test Is Distinct from Rational Basis Review.

¶53 In *Town of Dillon*, we explained that the police power "is an inherent attribute of sovereignty with which the state is endowed for the protection and

general welfare of its citizens." ¶ 25, 325 P.3d at 1038 (quoting *In re Interrogatories of the Governor on Chapter 118, Sess. Laws 1935*, 52 P.2d 663, 667 (Colo. 1935)). We held that the police power, though broad, is "limited by due process," *id.* at ¶ 26, 325 P.3d at 1039, such that legislation or regulation based on the exercise of the state's police power must "bear a rational relationship to a legitimate government interest," *id.* at ¶ 27, 325 P.3d at 1039. Under the approach we took there, which we described as essentially rational basis review, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged [legislation] actually motivated the legislature." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (outlining rational basis review in equal protection context).[12] In other words, the rational basis test ensures rational government enactments.

¶54 But the due process limitation we discussed in *Town of Dillon* is independent from the separate and distinct constraint located in article II, section 13 of the Colorado Constitution and guarded by what we have referred to in shorthand as our "reasonable exercise" test. *Cf. Heller*, 554 U.S. at 628 n.27 ("If all that was

---

[12] We note that even under rational basis review, a more searching inquiry is called for where a law exhibits animus, *Romer v. Evans*, 517 U.S. 620, 632 (1996), unsubstantiated fear, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985), or a "bare . . . desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

¶55 True, the reasonable exercise test demands that government enactments implicating the article II, section 13 right have a legitimate government end within the police power, such as promoting the public health, safety, or welfare. *Robertson*, 874 P.2d at 331. And as its name suggests, it requires a "reasonable" fit between purpose and means. *Id.* at 332. But in the article II, section 13 context, the ultimate function of the reasonable exercise test is to effectuate the substantive constraints imposed by article II, section 13 on otherwise rational government regulation.

¶56 Reflecting that function, the article II, section 13 reasonable exercise test—unlike ordinary rational basis review—demands not just a conceivable legitimate purpose but an actual one. *See Students for Concealed Carry*, 280 P.3d at 27. And, importantly, it does not tolerate government enactments that have either a purpose or effect of rendering the right to bear arms in self-defense a nullity. In short, the reasonable exercise test permits restrictions that may burden the right to bear arms but that still leave open ample means to exercise the core of that right; on the other hand, the test forbids restrictions that are so arbitrary or onerous as to amount to a denial of the right.

33

¶57   These features of the reasonable exercise test are apparent from our earliest application of article II, section 13.  In *Nakamura*, the challenged legislation prohibited unnaturalized foreign-born residents from hunting any wild bird or animal except "in defense of persons or property" and, "to that end," made it "unlawful for any unnaturalized foreign-born resident . . . to either own or be possessed of a shotgun or rifle of any make, or a pistol or firearm of any kind." 62 P.2d at 246.  We acknowledged that the state's identified interests were permissible ones: "[t]he state may preserve its wild game for its citizens" and "prevent the hunting and killing of same by aliens."  *Id.* at 247.  But we struck down the law nonetheless, reasoning that it was apparent that it was actually "designed to prevent possession of firearms by aliens, as much, if not more, than the protection of wild game within the state."  *Id.*

¶58   Importantly, we found it "equally clear" that the act had the *effect* of "wholly disarm[ing] aliens for all purposes."  *Id.*  We held that the state "cannot disarm any class of persons or deprive them of the right guaranteed under section 13, article 2 of the Constitution, to bear arms in defense of home, person, and property."  *Id.* In other words, "[t]he police power of a state . . . cannot be exercised in such manner as to work a practical abrogation of its provisions."  *Id.* (quoting *Smith v. Farr*, 104 P. 401, 406 (Colo. 1909)).

¶59   Our later cases just as clearly demonstrate the independent bite of the reasonable exercise test.  In *Blue*, we held that a statute prohibiting individuals

34

with prior felony convictions from possessing weapons was a constitutional exercise of the police power under article II, section 13. 544 P.2d at 391. "To be sure," we explained, "the state legislature cannot, in the name of the police power, enact laws which render nugatory our Bill of Rights and other constitutional protections." *Id.* But we did not read the felon-in-possession statute "as an attempt to subvert the intent of [article II, section 13]." *Id.* And in *Ford*, an as-applied challenge to the same statute, we expressly stated that "the specific limitations of [article II, section 13] must be superimposed on the statute's *otherwise valid language*," and that a state may "validly restrict or regulate the right to possess arms *where the purpose of such possession is not a constitutionally protected one*" such as defense of home, person, or property. 568 P.2d at 28 (emphases added); *see also City of Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972) (striking down ordinance that made it unlawful for a person to possess a firearm in a vehicle or in a place of business for purpose of self-defense).[13]

---

[13] We note that in *Pillow* we subjected the challenged statute to an overbreadth analysis under article II, section 13. *See also People v. Garcia*, 595 P.2d 228, 230 (Colo. 1979) (holding that overbreadth applies to restrictions on the right to bear arms). We have since made clear in *Graves* that, notwithstanding any suggestion to the contrary in our earlier opinions, "the overbreadth doctrine is confined to facial challenges to statutes that burden constitutionally protected speech or expressive conduct." ¶ 12 n.6, 368 P.3d at 323 n.6.

¶60　Finally, in *Robertson*, we again explicitly noted that the right to bear arms in self-defense under article II, section 13 could be regulated but not prohibited. 874 P.2d at 330 n.10. In upholding the Denver ordinance, we looked to evidence confirming the city council's expressed intent to "promote the health, safety, and security of the citizens of Denver" by "curbing crime—particularly homicides." *Id.* at 332 (concluding evidence at trial supported the ordinance's relationship to its statement of legislative intent). We further relied on evidence that although the city sought to prohibit the possession and use of approximately 40 firearms, closer to 2,000 remained available for purchase and use in the United States. *Id.* at 333. Given this evidence of the "narrow class of weapons regulated by the ordinance," we had no trouble concluding that it did not "impose such an onerous restriction on the right to bear arms as to constitute an . . . illegitimate exercise of the state's police power." *Id.*

¶61　In sum, under article II, section 13 of the Colorado Constitution, the government may regulate firearms so long as the enactment is (1) a reasonable exercise of the police power (2) that does not work a nullity of the right to bear arms in defense of home, person, or property. This test differs from rational basis review in that it requires an actual, not just conceivable, legitimate purpose related to health, safety, and welfare, and it establishes that nullifying the right to bear arms in self-defense is neither a legitimate purpose nor tolerable result. In these ways, it ensures that the specifically enumerated "right to bear arms in defense of

home, person and property" in article II, section 13 stands as an independent, substantive limitation on otherwise rational government action.

### C.  HB 1224 Does Not Run Afoul of Article II, Section 13.

¶62    Having clarified the appropriate standard for reviewing Plaintiffs' argument that HB 1224 is unconstitutional under article II, section 13, we now turn to the merits of their claim.  We conclude that HB 1224 constitutes a reasonable exercise of the police power and does not work a nullity of the right to bear arms in defense of home, person, or property under article II, section 13.

### 1.  HB 1224 Constitutes a Reasonable Exercise of Police Power.

¶63    We credit the trial court's finding that the purpose of HB 1224 was to "reduce the number of people who are killed or shot in mass shootings."  The court's finding is amply supported by the record and we affirm both lower courts' conclusions that this discrete purpose of the legislation lies well within the state's police power.  Indeed, it can hardly be argued that seeking to reduce the lethality of mass shootings and to contain their rippling, traumatic effects does not relate to the public health, safety, or welfare.  And beyond their contention about the definition of LCMs, which we examine and reject below, Plaintiffs make no argument that HB 1224 instead had an illegitimate purpose of nullifying the article II, section 13 right to bear arms in defense of home, person, or property.

¶64 We further agree with the court of appeals that the prohibition on LCMs is reasonably related to that legitimate—and increasingly critical—state interest. Evidence at trial established that the use of LCMs in mass shootings increases the number of victims shot and the fatality rate of struck victims. It also established that LCMs were used in some of the most horrific shootings in recent memory. These statistics have been deeply felt in Colorado, where LCMs played a lethal role in the Columbine and Aurora massacres. Finally, the record supports the trial court's finding that the pause created by the need to reload or replace a magazine creates an opportunity for potential victims to take life-saving measures. In short, the evidence overwhelmingly demonstrated the reasonableness of the General Assembly's choice to set a limit on the number of rounds that can be fired before a shooter needs to reload.

## 2. HB 1224 Does Not Work a Nullity of the Right to Bear Arms in Self-Defense.

¶65 The gravamen of Plaintiffs' claim that HB 1224 violates the state constitutional right to bear arms rests on their interpretation of the phrase "designed to be readily converted to accept." § 18-12-301(2)(a)(I). In their view, this language in the statutory definition of an LCM encompasses any magazine with a design that makes it capable of being "readily converted to accept" more than fifteen rounds. Because magazines with removable base pads can be readily converted to accept more than fifteen rounds, Plaintiffs argue that such magazines

38

fall under the statutory definition. And because 90% of detachable magazines contain removable base pads, Plaintiffs maintain that HB 1224 therefore bans the overwhelming majority of magazines, thus denying their right to bear arms under article II, section 13. We conclude that the statute's plain language belies Plaintiffs' construction.

¶66 We review issues of statutory construction de novo. *People v. Opana*, 2017 CO 56, ¶ 34, 395 P.3d 757, 764. In construing a statute, our primary purpose is to ascertain and give effect to the legislature's intent. *Id*. As such, where the plain meaning of a statute is clear, we need not look to other interpretive tools. *Goodman v. Heritage Builders, Inc.*, 2017 CO 13, ¶ 7, 390 P.3d 398, 401. We read statutory language in context, giving words and phrases their plain and ordinary meaning and avoiding constructions that would render any word or phrase superfluous. *People v. Iannicelli*, 2019 CO 80, ¶¶ 19–20, 449 P.3d 387, 391.

¶67 Because our analysis must begin with the text itself, we set forth the disputed language of HB 1224 again in full:

(2)(a) "Large-capacity magazine" means:

(I) A fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, *or that is designed to be readily converted to accept*, more than fifteen rounds of ammunition.

§ 18-12-301(2)(a)(I) (emphasis added).

¶68 First, if the legislature had intended the definition of an LCM to include any magazine with a design that made it "capable of being readily converted," it could

39

have used that language. Indeed, reading subsection (2)(a)(I) as a whole, the legislature used "capable of" just words earlier. § 18-12-301(2)(a)(I) (defining LCMs to include devices "capable of accepting . . . more than fifteen rounds of ammunition").

¶69 A word or phrase is presumed to bear the same meaning throughout a text, while a material variation in terms suggests a variation in meaning. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012). That the legislature used the phrase "*capable of* accepting," but immediately thereafter chose the much narrower "*designed to be* readily converted to accept" evinces a deliberate variation in meaning. Put differently, it is clear that "designed to be" must mean something *other than* merely "capable of."

¶70 This inference is buttressed by the plain and ordinary meaning of the word "designed." As the division below observed, the dictionary defines "designed" to mean "done, performed, or made with purpose and intent." *RMGO II*, ¶ 31 (quoting *Designed*, Webster's Third New International Dictionary 612 (2002)); *see also Designed, adj.*, Oxford English Dictionary Online (last updated June 2020) (defining "designed" to mean "[p]lanned, intended"). In short, a magazine "designed" to be readily converted to accept more than fifteen rounds requires an intent or purpose that a magazine merely "capable" of being so converted does not. Plaintiffs' construction, however, effectively equates these terms, and thus strips the phrase "designed to be" of its common meaning.

40

¶71    Notably, given the structure of the provision, the legislature would have achieved the meaning Plaintiffs suggest had it entirely *omitted* the words "designed to be" from the definition. So written, subsection (2)(a)(I) would include any "magazine . . . *capable of* accepting or [being] readily converted to accept" more than fifteen rounds.

¶72    We decline to "presume that the legislature used language idly and with no intent that meaning should be given to its language." *Goodman*, ¶ 7, 390 P.3d at 401 (quoting *People v. J.J.H.*, 17 P.3d 159, 162 (Colo. 2001)). Instead, "we must interpret a statute to give effect to all its parts." *Colo. Comp. Ins. Auth. v. Jorgensen*, 992 P.2d 1156, 1163 (Colo. 2000). Because Plaintiffs' construction would render meaningless the limiting words "designed to be," we reject it.

¶73    The legislative history of the provision buttresses our conclusion that the legislature deliberately included the words "designed to be." Notably, the bill lacked that language as originally introduced. H.B. 1224, 69th Gen. Assemb., 1st Reg. Sess. § 1 (Colo. 2013) (as introduced in House). Subsection (2)(a)(I) initially defined an LCM to include any "magazine . . . capable of accepting, or *that can be* readily converted to accept" more than the specified number of rounds. *Id.* But the legislature later replaced that original language with the wording that appears in the statute. In short, the General Assembly specifically amended the bill to be narrower than the reading Plaintiffs endorse.

41

¶74     Finally, "courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality." *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019).  Even if we were to conclude that the language "designed to be" were susceptible of multiple reasonable interpretations, under the doctrine of constitutional doubt, we would decline to read into the statute the constitutional problem that Plaintiffs' construction invites.  In sum, we conclude that HB 1224's plain language, its legislative history, and the doctrine of constitutional doubt all weigh against Plaintiffs' interpretation.

¶75     Plaintiffs counter that reading "designed" to connote purpose or intent improperly grafts an element of specific intent onto the crime of selling, transferring, or possessing LCMs after July 1, 2013.[14]  We disagree.  Although we conclude that "designed to be readily converted to accept" means more than "capable of being readily converted to accept," we do not construe the phrase to impose a subjective, specific intent requirement.  Instead, because "designed" does not refer to any particular subject whose mens rea is a necessary element of the

---

[14] Alternatively, Plaintiffs point to their trial expert's unrebutted testimony that expandable capacity was in fact a design goal of magazines with removable base pads, and that their purpose was not just to facilitate maintenance and cleaning. But the trial court specifically noted that it did not find this testimony credible and therefore accorded it little weight.  We will not second-guess that determination. *People v. Harlan*, 109 P.3d 616, 627–28 (Colo. 2005) ("[W]e cannot second-guess determinations of the trial court regarding witness credibility.").

crime (e.g., a parts manufacturer, a seller, a person in possession), we read it to convey only an objective reference. *Cf. Opana*, ¶ 13, 395 P.3d at 760 ("When the term 'intended' is used in the passive voice or as a unit modifier, without reference to a particular subject . . . , it is just as naturally understood to convey an objective reference, as in 'normally intended' or 'reasonably intended.'"). In the context of subsection (2)(a)(I), we conclude that a magazine "designed to be readily converted to accept" more than fifteen rounds is one that would be objectively understood as purposely created or intended for the purpose of being converted to accept more than fifteen rounds. Because the evidence Plaintiffs put forth at trial did not prove that all magazines with removable base pads meet this definition under any conceivable set of facts, we conclude that Plaintiffs' removable base pad theory did not carry their considerable burden to prove the statute unconstitutional beyond a reasonable doubt.

¶76    Instead, the overwhelming evidence demonstrated that limiting magazine capacity to fifteen rounds does not significantly interfere with the core of Coloradans' article II, section 13 right to bear arms in self-defense. Indeed, testimony at trial established that "[i]n no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more."

¶77    Moreover, HB 1224 is similar to the ordinance we upheld in *Robertson* in that it leaves available "ample weapons" for self-defense. *Robertson*, 874 P.2d at 333. Indeed, the parties here stipulated that "thousands of models and variants of

43

firearms with detachable box magazines remain available for lawful purchase and use for home defense in Colorado," and that virtually "every gun that was available before July 1, 2013, is compatible with magazines holding 15 or fewer rounds." And HB 1224 contains a "grandfather clause" that allows a person to maintain continuous possession of LCMs if they were owned on the law's effective date. § 18-12-302(2)(a).

¶78 As we made clear in *Robertson*, the "right to bear arms is not an unlimited right and is subject to reasonable regulation." 874 P.2d at 329 (quoting *Arnold v. City of Cleveland*, 616 N.E.2d 163, 172 (Ohio 1993)). HB 1224 constitutes a reasonable exercise of the police power and does not nullify the article II, section 13 right.[15] We hold that Plaintiffs failed to prove beyond a reasonable doubt that HB 1224 violates the state constitutional right to bear arms. We therefore affirm the judgment of the court of appeals.

---

[15] Although we decide this matter under the Colorado Constitution, we observe that courts that have considered an LCM prohibition even more restrictive than the one at issue here under the Second Amendment have overwhelmingly concluded that such legislation survives intermediate scrutiny. *See, e.g.*, *Worman v. Healey*, 922 F.3d 26, 41 (1st Cir. 2019) (upholding Massachusetts' ten-round limit); *Ass'n of N.J. Rifle & Pistol Clubs. v. Attorney Gen. N.J.*, 910 F.3d 106, 122–24 (3d Cir. 2018) (upholding New Jersey's ten-round limit); *N.Y. State Rifle & Pistol Ass'n. v. Cuomo*, 804 F.3d 242, 260–64 (2d Cir. 2015) (upholding Connecticut's and New York's ten-round limits); *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011) (upholding Washington, D.C.'s ten-round limit).

## IV. Conclusion

¶79     We hold that HB 1224 is a reasonable exercise of the police power that has neither the purpose nor effect of nullifying the right to bear arms in self-defense encompassed by article II, section 13 of the Colorado Constitution.  Accordingly, we affirm the judgment of the court of appeals.