The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 4, 2021

**2021COA10**

**No. 18CA0481, *Peo v Plemmons* — Crimes — Assault in the Second Degree; Constitutional Law — Due Process — Vagueness**

In this proceeding, a division of the court of appeals considers whether section 18-3-203(1)(h), C.R.S. 2020, under which a person commits second degree assault if he or she spits on a peace officer with "intent to infect, injure, or harm," is unconstitutionally vague because of a lack of a statutory definition of "harm." Relying on the precedent of *People v. Graves*, 2016 CO 15, and the cases which proceeded it, this division assesses the statute's constitutionality using the beyond a reasonable doubt standard. Applying tools of statutory construction, the division concludes that the meaning of "harm" includes psychological and emotional harm. Because the meaning of the word "harm" can be ascertained, Plemmons cannot

prove beyond a reasonable doubt that the statute is unconstitutionally vague.

However, a member of this division urges the Colorado Supreme Court to reconsider its longstanding precedent of requiring that a state statute must be found unconstitutional beyond a reasonable doubt before determining that it violated the Colorado Constitution.

Court of Appeals No. 18CA0481
La Plata County District Court No. 16CR632
Honorable William L. Herringer, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cheryl Lynette Plemmons,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE GROVE
Davidson*, J., concurs
Taubman*, J., specially concurs

Announced February 4, 2021

Philip J. Weiser, Attorney General, Daniel De Cecco, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jacob B. McMahon, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     After she spat on two deputies conducting a welfare check in her home and then spat on one of them again while detained in the back of a police cruiser, defendant, Cheryl Lynette Plemmons, was charged with three counts of second degree assault for causing bodily fluids to come into contact with a peace officer. A jury found her guilty of each of the charges — two under section 18-3-203(1)(h), C.R.S. 2020, and one under section 18-3-203(1)(f.5), C.R.S. 2020.

¶ 2     In this appeal, Plemmons contends that two of her convictions should be reversed because section 18-3-203(1)(h) is unconstitutionally vague, and that in any event the evidence at trial was insufficient to establish that she spat on the deputies with the intent to "infect, injure, or harm" them, as the statute requires. She also asserts that all three of her convictions should be reversed because the trial court erroneously instructed the jury on the definition of "harm," and that the trial court erred by not holding an evidentiary hearing on her motion to suppress. Because we disagree with her arguments, we affirm Plemmons's convictions.

## I. Background

¶ 3    On December 28, 2016, Plemmons planned to commit suicide. She called a friend, explained that she wanted to end her life, and asked the friend to come get her dog. Plemmons's friend anonymously called the police. Two sheriff's deputies, Scott Blakely and Richard Paige, responded to Plemmons's home for a welfare check.

¶ 4    When they arrived, Plemmons was at home with another friend, Harry Waterman. As soon as the deputies entered the house, Plemmons, who was visibly drunk, began berating them and insulting them in a variety of colorful ways. She repeatedly told them to leave. Eventually, Plemmons became calm enough to talk to Deputy Paige, and they began discussing her suicide plans. She talked about slitting her throat and then picked up a small pen knife, pointed it at one of the deputies, and flung it across the room. The handle hit Waterman in the back but did not injure him.

¶ 5    In response, the deputies handcuffed Plemmons and placed her in protective custody for her safety and theirs. Because it was cold outside and Plemmons was not dressed for the weather, they helped Plemmons put on her coat and boots. As they did so,

Deputy Blakely explained to Plemmons that they were transporting her to Mercy Medical Center to be treated. Plemmons responded by intentionally spitting in both deputies' faces. The protective custody then turned into an arrest.

¶ 6 The deputies placed Plemmons in the back of a patrol car for transport to Mercy Medical Center. As Deputy Paige drove, Plemmons continued to yell obscenities and insults. She also spit on Deputy Paige's face and head through the partition. The spitting was so intense that Deputy Paige pulled over and placed a spit hood over Plemmons's head.

¶ 7 For the spitting incidents inside the house, Plemmons was charged with two counts of second degree assault under section 18-3-203(1)(h). For spitting on Deputy Paige in the patrol car, Plemmons was charged with one count of second degree assault under section 18-3-203(1)(f.5). A jury found her guilty of all charges.

## II. Vagueness Challenge

¶ 8 Plemmons contends that section 18-3-203(1)(h), under which a person commits second degree assault if she spits on a peace

officer with "intent to infect, injure, or harm," is unconstitutionally vague, both facially and as applied to her. We disagree.

### A. Governing Law and Standard of Review

¶ 9 We review constitutional challenges to statutes de novo, and a party challenging a statute's constitutionality "bears the burden of proving its unconstitutionality beyond a reasonable doubt." *Dean v. People*, 2016 CO 14, ¶ 8. We will not invalidate a statute unless it is so infirm that it cannot be preserved by adopting a limiting construction consistent with the legislature's intent. *Whimbush v. People*, 869 P.2d 1245, 1248 (Colo. 1994).[1]

¶ 10 "The essential inquiry in addressing a void for vagueness challenge is whether the statute 'forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must

---

[1] For the first time in her reply brief, Plemmons urges us "not [to] apply the beyond a reasonable doubt standard because it is out of step with our supreme court's latest thinking and because the standard is badly misguided." We do not consider arguments raised for the first time in a reply brief. *See, e.g., People v. Boles*, 280 P.3d 55, 61 n.4 (Colo. App. 2011). But even if the question of what standard to apply had been timely raised, we would remain bound by supreme court precedent. *See Rocky Mountain Gun Owners v. Polis*, 2020 CO 66, ¶ 30 ("[The] presumption of constitutionality can be overcome only if it is shown that the enactment is unconstitutional beyond a reasonable doubt.").

necessarily guess as to its meaning and differ as to its application.'" *People v. Gross*, 830 P.2d 933, 937 (Colo. 1992) (citation omitted). "This requirement of reasonable definiteness provides assurance that a penal statute gives fair warning of proscribed conduct so that persons may guide their actions accordingly." *People v. Devorss*, 277 P.3d 829, 835 (Colo. App. 2011). It also "ensures that statutory standards are sufficiently specific so that police officers and other actors in the criminal justice system can avoid arbitrary and discriminatory application." *People in Interest of L.C.*, 2017 COA 82, ¶ 8. "The degree of vagueness tolerated depends on the nature of the enactment . . . ." *People v. Graves*, 2016 CO 15, ¶ 18. Statutes that threaten "to inhibit speech or expressive conduct protected by the First Amendment" require greater specificity than statutes that do not. *Id.*

¶ 11     Plemmons filed a motion to dismiss that raised a vagueness challenge to section 18-3-203(1)(h), thereby preserving this issue for appeal.

B.     Analysis

¶ 12     As relevant here, a person commits second degree assault if

5

> [w]ith intent to infect, injure, or harm another person whom the actor knows or reasonably should know to be engaged in the performance of his or her duties as a peace officer, . . . she causes such person to come into contact with . . . saliva . . . by any means, including by throwing, tossing, or expelling such fluid or material.

§ 18-3-203(1)(h).

¶ 13    The crux of Plemmons's argument is that the evidence did not establish that she intended to infect or injure the deputies by spitting on them while in her home, and that, in the absence of a statutory definition, the remaining possibility — that she committed second degree assault because she intended to "harm" them — is unconstitutionally vague.  Although we determine that "harm" as it appears in section 18-3-203(1) is ambiguous, it does not follow from that conclusion that section 18-3-203(1)(h) is unconstitutionally vague, either facially or as applied.  *See People v. Rostad*, 669 P.2d 126, 128 (Colo. 1983) ("Analytical difficulty cannot be deemed synonymous with constitutional vagueness.").  Rather, via section 18-3-203(1)(h) and section 18-3-204(1)(b), C.R.S. 2020 (third degree assault), the General Assembly has made clear that it is a criminal act to intentionally spit on a peace officer with any malign intent.

And while that statutory proscription is not, on its own, dispositive of Plemmons's vagueness challenge, we also conclude that the lack of a definition of "harm" does not invite arbitrary or discriminatory enforcement because the General Assembly's intent may be ascertained by resorting to the legislative history and the rules of statutory construction.

¶ 14 Consistent with the supreme court's directive in *Graves*, ¶ 25, we first "examine the vagueness of the law in light of [Plemmons's] conduct" before turning to her facial challenge.

### 1. As-Applied Challenge

¶ 15 "Vague laws are unconstitutional because they offend due process" by, in part, "fail[ing] to give fair notice of the conduct prohibited." *People v. Hickman*, 988 P.2d 628, 643 (Colo. 1999). Arguing that her conduct was "at the ill-defined margin of second and third degree assault," Plemmons contends that section 18-3-203(1)(h) did not provide her with adequate notice of the mens rea associated with second degree assault.

¶ 16 "A law is unconstitutional only if it 'is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no

standard of conduct is specified at all.'" *Bd. of Educ. v. Wilder*, 960 P.2d 695, 703 (Colo. 1998) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). Thus, to prevail on an as-applied constitutional challenge, "it must be shown that the statute does not, with sufficient clarity, prohibit the conduct against which it is enforced." *People in Interest of L.C.*, ¶ 10.

¶ 17　　Irrespective of whether it amounts to a felony or misdemeanor, Colorado law plainly proscribes intentionally spitting in a police officer's face with malign intent. *See Graves*, ¶ 19 ("Because due process objections to vagueness rest on lack of notice, such challenges cannot succeed in a case where reasonable persons would know that their conduct puts them at risk."). No matter what Plemmons hoped to accomplish by her actions, no reasonable person could conclude that they were permissible under Colorado law. Her as-applied challenge therefore cannot succeed. *See Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006) (holding that even where statutory standards are not sufficiently clear to eliminate the risk of arbitrary enforcement, an as-applied challenge will fail if "the conduct at issue falls within the core of the statute's prohibition").

## 2. Facial Challenge

¶ 18    Turning to Plemmons's facial challenge, we note at the outset that the state of the law in this area is not entirely clear. As a general matter, "an individual who engages in conduct that is clearly proscribed by the statute cannot challenge the vagueness of the law as applied to the conduct of others." *Graves*, ¶ 25; *accord Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). But as *Graves* observed, the United States Supreme Court "appears to have backed away from the position in *Flipside*, 455 U.S. at 497, that a statute may be declared facially void for vagueness only if it is 'impermissibly vague in all its applications.'" *Graves*, ¶ 25 n.8 (citing *Johnson v. United States*, 576 U.S. 591, 602 (2015)). Accordingly, Plemmons urges us to declare section 18-3-203(1)(h) unconstitutionally vague on its face even if we reject her as-applied vagueness challenge.

¶ 19    We conclude that we need not decide whether *Johnson* discarded the "impermissibly-vague-in-all-applications" standard for facial challenges, *see Graves*, ¶ 25 n.8, because, for the reasons we outline below, there is a reliable way to interpret the scope of the second degree assault statute. *See Johnson*, 576 U.S. at 597-98

9

(holding that facial vagueness challenge can succeed only if there is "no reliable way" to interpret the statute, or there is "grave uncertainty" about its scope); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) ("[T]he more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement.'") (citation omitted).

¶ 20     Key to evaluating Plemmons's challenge is thus whether the lack of a definition of "harm" in section 18-3-203(1)(h) invites arbitrary or discriminatory enforcement of the second degree assault statute. Plemmons argues that the risk of arbitrary and discriminatory enforcement is real because, as she puts it, "[t]he amorphous line between 'harm' in second degree assault and 'harass, annoy, threaten, or alarm' in third degree assault allows state officials to arbitrarily select felony and misdemeanor charges for substantially the same conduct."[2] Asserting that people of

---

[2] In making this argument in her opening brief, Plemmons hints at — but does not raise — an equal protection challenge under the Colorado Constitution. *See People v. Marcy*, 628 P.2d 69, 74-75 (Colo. 1981) ("[S]eparate statutes proscribing with different penalties what ostensibly might be different acts, but offering no

ordinary intelligence must guess as to the word's meaning, Plemmons highlights the fact that while the prosecutor urged the trial court to define "harm" in terms of bodily injury, the court ultimately instructed the jurors that the term encompasses only emotional or psychological harm. That legal professionals fundamentally disagreed over the definition of "harm," Plemmons argues, establishes the statute's vagueness.

### a. "Harm" is Ambiguous

¶ 21    Spitting on a peace officer for an improper reason is prohibited by two different statutes, section 18-3-203(1)(h) and section 18-3-204(1)(b), that are differentiated only by the actor's intent. Under section 18-3-203(1)(h), spitting on a peace officer with the intent to "infect, injure, or harm" is second degree assault, a felony. Under section 18-3-204(1)(b), spitting on a peace officer with the intent to

---

intelligent standard for distinguishing the proscribed conduct, run afoul of equal protection under state constitutional doctrine."), *superseded by statute*, Ch. 212, sec. 4, 1981 Colo. Sess. Laws 973. In her reply brief, Plemmons comes closer by citing to *Marcy* and other similar cases, but because we will not consider issues raised for the first time in a reply brief, *People v. Grant*, 174 P.3d 798, 803 (Colo. App. 2007), to the extent that Plemmons intends to raise an equal protection challenge, we do not address it.

"harass, annoy, threaten, or alarm" is third degree assault, a misdemeanor.

¶ 22    At the threshold, we agree with the trial court's conclusion that "harm," as that term appears in section 18-3-203(1)(h), is ambiguous.  Statutory language is ambiguous if it is "susceptible of more than one reasonable interpretation," *People v. Diaz*, 2015 CO 28, ¶ 13, and here, "harm" is a broad term that could reasonably be interpreted in a number of different ways, including, among other things, physical injury or emotional, reputational, or financial damage.

¶ 23    Ambiguities in a criminal statute can create due process problems because "[t]he interest in preventing selective and arbitrary application of laws requires legislative bodies to establish definite minimal guidelines to govern law enforcement; otherwise, police, prosecutors and juries would be encouraged to exercise their personal perspectives without significant restraint."  *People v. Randall*, 711 P.2d 689, 692 (Colo. 1985).  But "ambiguity alone does not make a statute unconstitutionally vague."  *People in Interest of M.C.*, 2012 COA 64, ¶ 28.  Rather, due process is violated only when legislation is so "vague, indefinite, and uncertain that the

courts are unable to determine, with reasonable certainty, what the legislature intended, or so incomplete and inconsistent in its provisions that it cannot be executed." *Bd. of Cnty. Comm'rs v. City & Cnty. of Denver*, 194 Colo. 252, 257, 571 P.2d 1094, 1097 (1977) (citation omitted).

¶ 24 We thus turn to whether we are able to determine with reasonable certainty what the General Assembly intended "harm" to mean when it included that term in section 18-3-203(1)(h).

### b. Scope of "Harm"

¶ 25 When a statute is ambiguous, we use tools of statutory interpretation to discern its meaning. *People v. McEntee*, 2019 COA 139, ¶ 11. In discerning the General Assembly's intent, we may consider, among other things, the object sought to be attained, the circumstances under which the statute was enacted, the legislative history, former statutory provisions, and the consequences of a particular construction. § 2-4-203(1), C.R.S. 2020.

¶ 26 Before 2015, section 18-3-204(1)(b) provided that a person committed misdemeanor third degree assault if she acted "with intent to infect, injure, harm, harass, annoy, threaten, or alarm" an officer when causing the officer to come into contact with saliva or

other fluids.  In 2015, the General Assembly removed "infect," "injure," and "harm" from the misdemeanor assault statute and added those terms to a new subsection of section 18-3-203, which defines second degree assault.  Ch. 337, secs. 2, 3, §§ 18-3-203, -204, 2015 Colo. Sess. Laws 1366-67.  Under the amended section 18-3-203(1)(h), a person commits second degree assault if, "[w]ith intent to infect, injure, or harm" a peace officer, she "causes [the peace officer] to come into contact with . . . saliva . . . by any means . . . ."

¶ 27    An early draft of the bill would have simply reclassified as a felony *any* spitting on a peace officer with the intent to injure, infect, harm, harass, annoy, threaten, or alarm.  S.B. 15-067, 70th Gen. Assemb., 1st Reg. Sess. (Colo. 2015) (as introduced in Senate, Jan. 14, 2015).  But legislators accepted amendments on the House floor intended to prevent "over-reaching" and making conduct such as "spitting on the boots" of an emergency responder a felony.  2d Reading on S.B. 15-067 before the H., 70th Gen. Assemb., 1st Reg. Sess. (May 4, 2015).

¶ 28    Ultimately, the legislation enacted in 2015 bifurcated the original statute.  Spitting on an officer with the intent to "harass,

14

annoy, threaten, or alarm" remained misdemeanor third degree assault. § 18-3-204(1)(b). But the new statute increased the severity of punishment for spitting on a police officer with the intent to "infect, injure, or harm" by making that a felony second degree assault. § 18-3-203(1)(h).

¶ 29   Senator John Cooke, one of the bill's co-sponsors, explained that the change was intended in part to account for the psychological trauma arising from unwanted contact with bodily fluids. As he put it, "the reason that I felt that [accounting for emotional or psychological harm] was important is because, a lot of times that has more damage than the physical . . . damage, because of the . . . psychological damage of . . . later on, you could be contracting a communicable disease." Hearings on S.B. 15-067 before the S. Judiciary Comm., 70th Gen. Assemb., 1st Reg. Sess. (Jan. 28, 2015). Witnesses testifying in support of the bill likewise described both the psychological trauma that they suffered and the extensive prophylactic treatment that was required following exposure to bodily fluids.

¶ 30   Based in part on Senator Cooke's description of the bill's purpose, the trial court concluded that "the legislature included the

15

term 'harm' to make sure that a person who exposes an officer to bodily fluids with the intent to cause such psychological or emotional harm is not shielded by the fact that the bodily fluids were not, in fact, infectious." We agree with the trial court's understanding of the legislative intent and, accordingly, conclude that the trial court narrowed the statute enough to preserve its constitutionality.

¶ 31    Indeed, instructing the jury that "harm" includes only psychological or emotional harm was both consistent with the General Assembly's intent and an appropriate way of ensuring the second degree assault statute's constitutionality. *See Whimbush*, 869 P.2d at 1248. Moreover, narrowing "harm" as the trial court did ensured that there would be no redundancy with the term "injure." *See People v. Rediger*, 2018 CO 32, ¶ 22 ("[T]he use of different terms signals an intent on the part of the General Assembly to afford those terms different meanings.") (citation omitted). And, as we discuss in more detail below, it also appropriately distinguished felony second degree assault under section 18-3-203(1)(h) from misdemeanor third degree assault under section 18-3-204(1)(b).

¶ 32　In sum, after looking to the legislative history of the second degree assault statute and applying the rules of statutory construction, we are not left with any "grave uncertainty" about the statute's scope. *Johnson*, 576 U.S. at 597. And, absent that uncertainty, we further conclude that section 18-3-203(1)(h) is not likely to invite arbitrary or discriminatory enforcement. It is thus not unconstitutionally vague on its face.

### III.　Sufficiency of the Evidence

¶ 33　Plemmons contends that we should reverse her convictions under section 18-3-203(1)(h) because the evidence at trial was insufficient to prove beyond a reasonable doubt that she intended to harm the deputies by spitting in their faces while still inside the house. We conclude that there was sufficient evidence to support these two convictions.

### A.　Standard of Review

¶ 34　When assessing the sufficiency of the evidence in support of a guilty verdict, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt.

*People v. Sprouse*, 983 P.2d 771, 777 (Colo. 1999). Reviewing a sufficiency challenge de novo, *McCoy v. People*, 2019 CO 44, ¶ 27, we give the prosecution the benefit of every reasonable evidentiary inference that might fairly be drawn while recognizing that the jury determines the evidence's weight and resolves evidentiary conflicts, inconsistencies, and disputes. *Sprouse*, 983 P.2d at 778. More than a modicum of relevant evidence is necessary to rationally support a conviction beyond a reasonable doubt; thus, "[v]erdicts in criminal cases may not be based on guessing, speculation, or conjecture." *Id.*

### B. Analysis

¶ 35 Plemmons admitted that she intentionally spat at both deputies inside her home, but she denied that she intended to harm them. Instead, she claimed, her act was intended to send several messages, including "please don't hurt me, please don't take me to jail, how can this be happening to someone who's suicidal. Again, there were just no words to express it."

¶ 36 To be sure, the jurors were free to take Plemmons at her word and, applying the court's instruction on the meaning of "harm," could have concluded that she did not intend to inflict emotional or

psychological harm on the deputies when she spat in their faces. But they also could have doubted Plemmons's claim and instead looked to other evidence reflecting her mental state. *See People v. Grant*, 174 P.3d 798, 812 (Colo. App. 2007) ("'A defendant's mental state may be inferred from his or her conduct and other evidence,' including the circumstances surrounding the commission of the crime.") (citations omitted). Deputy Blakely, for example, described Plemmons's demeanor as "highly agitated," and said that "she was yelling at us when we came into the residence." He testified that she unleashed "a long string of insults" and, as the conversation went on, "produced a knife from the area next to her on the kitchen table . . . [and] immediately sort of brandished it at us." For her part, Plemmons conceded that she yelled at the deputies and used language that was demeaning to them. She acknowledged that she used threatening language toward one officer, implying that neither he nor his family would be safe, and admitted that she continued to spit at the deputies multiple times throughout the encounter.

¶ 37    Given the extensive evidence about Plemmons's demeanor and the circumstances leading to the charged acts, we conclude there was substantial and sufficient evidence to establish beyond a

reasonable doubt that she intended to inflict emotional or psychological harm on the deputies when she spit on them inside her house.

### IV.   Jury Instruction Definition of "Harm"

¶ 38    Plemmons contends that all of her convictions should be reversed because the trial court erroneously instructed the jury on the definition of "harm."  We are not persuaded.

### A.   Governing Law and Standard of Review

¶ 39    We apply a two-tier standard of review to jury instructions. *People v. Stellabotte*, 2016 COA 106, ¶ 18, *aff'd on other grounds*, 2018 CO 66.  First, "[w]e review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law." *People v. Jones*, 2018 COA 112, ¶ 24.  Second, we review a trial court's formulation of additional instructions (i.e., those that supplement the standard instructions) for an abuse of discretion.  *People v. Riley*, 2015 COA 152, ¶ 22.

¶ 40    The trial court abuses its discretion only "when its decision is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law." *Id.* (quoting *People v. Orozco*, 210 P.3d 472, 475 (Colo. App. 2009)).  So long as

20

the trial court's instructions are correct statements of the law and "fairly and adequately cover the issues presented," we will not disturb a trial court's ruling on a tendered jury instruction. *People v. Van Meter*, 2018 COA 13, ¶ 41 (citation omitted).

¶ 41    Plemmons contemporaneously objected to the instruction in question, but she did not contemporaneously raise several of the arguments that she asserts on appeal. Because we determine that the instruction was not erroneous in any respect, however, we need not specify which standard of reversal applies to each of her arguments.

## B.    Analysis

¶ 42    In its order denying Plemmons's claim of constitutional vagueness, the trial court stated that it was considering a jury instruction on the definition of "harm" that conformed to the limiting construction of that term that it had just adopted. The court proposed language for the instruction and invited briefing on the issue from the parties. After considering their input, the court instructed the jury as follows:

> The term "harm" as it is issued in Instruction No. 10 & 11 means psychological or emotional harm. It can include the following

1. Fear,

2. Anxiety,

3. Or any other type of significant distress

> that is based upon the danger of injury or infection from contact with bodily fluids. The defendant need not have acted with the intent to cause harm that is permanent or long-lasting in nature, but the defendant's intent must have been to cause psychological or emotional harm that is not fleeting or minimal in nature.

Instructions 10 and 11 were the elemental instructions for second degree assault under section 18-3-203(1)(h) and section 18-3-203(1)(f.5).

¶ 43　Plemmons contends that the court's definition of "harm" was flawed in five different ways: (1) it deviated from the text of the statute, which says nothing about emotional or psychological harm; (2) it blurred the line between second and third degree assault; (3) it allowed the jury to speculate because, by using the phrase "can include," the instruction suggested that "fear, anxiety, or any other type of significant distress" was not an exhaustive list; (4) it was drafted in a way that left unclear whether the phrase "based upon the danger of injury or infection from contact with bodily fluids" modified each of the examples of emotional or psychological harm,

or only the last one; and (5) it left uncertain how serious the intended harm would need to be in order to fall within the statute. Addressing each of these arguments in turn, we discern no error.

¶ 44  First, we have already concluded that section 18-3-203(1)(h) is not unconstitutionally vague and that the trial court's limiting construction of "harm" was consistent with the General Assembly's intent. The instruction was likewise consistent with both the trial court's interpretation of the statute and the intent of the legislature.

¶ 45  Second, we are not persuaded that the court's definition of "harm" blurred the line between second degree and third degree assault. The instruction provided that the emotional or psychological harm for second degree assault must necessarily be based "upon the danger of injury or infection from contact with bodily fluids," thereby making clear that the only way for an actor to cause the necessary harm would be to direct her spit in a way that would create that risk for the officer. Spitting in an officer's face would obviously do so, but spitting elsewhere, such as on an officer's boots or back, might not.

¶ 46  Third, stating that psychological or emotional harm "can include . . . [f]ear, . . . [a]nxiety, . . . [o]r any other type of significant

23

distress" did not encourage the jurors to speculate. A reasonable reading of the instruction establishes that "fear" and "anxiety" were examples of the types of psychological or emotional harm that would fall within the statute, and that "any other type of significant distress" was a catchall that permitted the jury to consider whether, by spitting on the deputies, Plemmons intended to inflict any other type of emotional or psychological harm. Even if an exhaustive list were required, the definition's catchall language ensured that the definition was complete and did not invite the jurors to venture outside the bounds of the trial court's limiting construction.

¶ 47 Fourth, the structure of the instruction's second sentence makes clear that the phrase "based upon the danger of injury or infection from contact with bodily fluids" applies to all three examples included in that sentence. The trial court achieved this by numbering the three examples and offsetting them from the remainder of the instruction.

¶ 48 Fifth, the jury instruction can be administered clearly. Contrary to Plemmons's assertion, clarifying that the harm associated with second degree assault need not be permanent, but also must be more than "fleeting or minimal in nature," helps

24

differentiate "harm" from the lesser injuries such as "alarm" or "annoy" that appear in the third degree assault statute, section 18-3-204(1)(b).

## V.     Suppression Hearing

¶ 49     Plemmons contends that she was entitled to an evidentiary hearing on her motion to suppress, and that we should remand the case for a hearing and conditionally order a new trial pending the hearing's outcome. Because there were no "issue[s] of fact necessary to the decision of the motion," Crim. P. 41(e), we conclude that no hearing was required.

### A.     Relevant Facts

¶ 50     Before trial, Plemmons filed a motion to suppress "all statements, observations, and evidence that police acquired" when they entered her home without a warrant. The trial court denied the motion without an evidentiary hearing because, it found, whether or not deputies entered the house lawfully, Plemmons's commission of a new criminal act once they were inside was sufficiently attenuated from any unlawful entry to render the exclusionary rule inapplicable.

25

### B. Governing Law and Standard of Review

¶ 51     A trial court's ruling on a suppression motion presents a mixed question of fact and law. *People v. Martin*, 222 P.3d 331, 334 (Colo. 2010). We defer to the trial court's findings of fact if they are supported by competent evidence in the record. *People v. Stock*, 2017 CO 80, ¶ 13. However, we review the trial court's conclusions of law de novo. *Id.*

¶ 52     "When there is a Fourth Amendment violation, courts can apply the exclusionary rule to suppress evidence that was discovered as a result of the violation." *People v. Tomaske*, 2019 CO 35, ¶ 10. The rule is "intended to deter improper police conduct," and thus "should not be applied in cases where the 'deterrence purpose is not served, or where the benefits associated with the rule are minimal in comparison to the costs associated with the exclusion of probative evidence.'" *People v. Altman*, 960 P.2d 1164, 1168 (Colo. 1998) (citation omitted).

¶ 53     The attenuation doctrine is one exception to the exclusionary rule. It "allows the admission of evidence obtained as the fruit of an illegal warrantless search or seizure when the connection between the lawless conduct of the police and the discovery of the challenged

26

evidence has 'become so attenuated as to dissipate the taint.'"
*People v. Lewis*, 975 P.2d 160, 170 (Colo. 1999) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Or, put another way, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

¶ 54   The attenuation doctrine frequently applies when an individual responds to an officer's Fourth Amendment violation with a criminal act of her own. "'[A]n independent and willful criminal act against a law enforcement officer' . . . break[s] the causal chain between the police misconduct and the evidence of the new crime" for two reasons. *Tomaske*, ¶ 13 (quoting *People v. Doke*, 171 P.3d 237, 240 (Colo. 2007)). First, "admission of the contested evidence does not incentivize illegal searches by the police," and second, "a contrary approach would 'effectively give the victim of police

misconduct carte blanche to respond with any means, however violent.'" *Id.* (quoting *Doke,* 171 P.3d at 240-41).

¶ 55 Plemmons preserved this issue for appellate review by filing her motion to suppress.

## C. Analysis

¶ 56 The question before us is whether the trial court was required to hold an evidentiary hearing on Plemmons's motion to suppress, or whether it could simply assume that the deputies' entry was illegal and then, based on the undisputed facts, apply the attenuation doctrine as a matter of law.

¶ 57 Our supreme court has consistently applied the attenuation doctrine when a person who is confronted with an illegal search responds by committing a new crime. *Tomaske,* ¶ 2; *Doke,* 171 P.3d at 240. In *Doke,* sheriff's deputies went to Doke's residence to serve him with process in a civil case. 171 P.3d at 238. No one answered the doorbell, but after walking to the back of the house and peering through a window, the deputies observed a man, later identified as Doke, sitting in a recliner with his eyes closed. *Id.* After they pounded on the door with no response, the deputies opened the door a few inches and identified themselves. *Id.* Doke

28

jumped up, grabbed a shotgun, and pointed it at them. *Id.* The

deputies withdrew and called the SWAT team, which eventually

entered the house and arrested Doke. *Id.* The deputies then

obtained a search warrant for the house, recovered the shotgun,

and took photographs and videos of the property. *Id.*

¶ 58     This incident resulted in several criminal charges against

Doke. Asserting that statements that he made to law enforcement,

evidence that the deputies obtained from him, and the evidence

seized and observed pursuant to the search warrant were all

obtained illegally, he filed a motion to suppress. *Id.* The trial court

granted the motion, but the supreme court reversed. As relevant

here, the court held that it "need not reach the issue of whether the

deputies violated Doke's Fourth Amendment rights because the

evidence sought to be suppressed is admissible . . . irrespective of

whether the deputies committed an unconstitutional trespass." *Id.*

at 239.

¶ 59     Eleven years later, the Colorado Supreme Court drew the same

bright line in *Tomaske.* After police entered Tomaske's property

without a warrant and chased him into his house in violation of the

Fourth Amendment, Tomaske "responded by resisting and allegedly

assaulting a police officer." *Tomaske,* ¶ 1. The district court granted Tomaske's motion to suppress, but, holding that Tomaske's "decision to resist 'br[oke] the causal connection between the police illegality and the evidence of the new crime,'" the supreme court reversed. *Id.* at ¶ 17 (citation omitted). Tomaske's commission of a new criminal act was key to application of the attenuation doctrine: "[U]nlike the scenario where police officers' misconduct leads to their *discovery* of evidence of a *completed* crime (e.g., finding contraband), this case involves police misconduct that led to the *commission* of a *new* crime. The exclusionary rule applies to the former situation, not the latter." *Id.* at ¶ 18.

¶ 60 Plemmons argues that *Doke* and *Tomaske* are distinguishable because the trial courts in both cases held hearings that created an evidentiary foundation for the attenuation analysis. Without a developed record, she maintains, it is not possible to apply the United States Supreme Court's three-factor test for attenuation, which requires assessment of (1) the temporal proximity between any unlawful stop and the search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the

30

official misconduct. *Strieff*, 579 U.S. ___, 136 S. Ct. at 2061-62.[3]

*Strieff*, however, did not involve the commission of a new crime in the wake of a police officer's Fourth Amendment violation. Instead, in that case, after conducting an illegal stop, the officer discovered that the defendant had an outstanding arrest warrant. *Id.* at ___, 136 S. Ct. at 2060. In other words, the officer's misconduct in *Strieff* led to his "*discovery* of evidence of a *completed* crime," a situation that calls for an evidence-based application of the attenuation doctrine, rather than to the "*commission* of a *new* crime," which, under *Tomaske*, does not. *Tomaske*, ¶ 18.

¶ 61    By applying the attenuation exception to Plemmons's new criminal acts, the trial court hewed to the bright line that *Doke* and *Tomaske* drew. No fact-intensive inquiry was necessary because it was not contested that the charged acts occurred after the deputies

---

[3] Plemmons bases her suppression argument on the Fourth Amendment alone and does not assert that the trial court should have excluded the evidence under article II, section 7 of the Colorado Constitution. *See People v. McKnight*, 2019 CO 36, ¶ 61. We therefore do not reach this issue. *See People v. Lewis*, 2017 COA 147, ¶ 12 n.2 (noting that if a defendant does not explicitly invoke the state constitution, "we must presume the defendant's objections are based on federal, not state, constitutional grounds, and limit our review accordingly") (citation omitted).

entered her home. With the causal chain broken, the trial court correctly decided that the attenuation doctrine applied without regard to the legality of the deputies' entry. And, that conclusion correctly encompassed not only the charged acts themselves, but also other evidence probative of Plemmons's intent and state of mind. *See People v. Breland*, 728 P.2d 763, 765 (Colo. App. 1986) (holding that evidence that was "probative" of an offense that occurred after an officer's warrantless entry "was not subject to suppression pursuant to the exclusionary rule").

## VI. Conclusion

¶ 62    The judgment is affirmed.

JUDGE DAVIDSON concurs.

JUDGE TAUBMAN specially concurs.

JUDGE TAUBMAN, specially concurring.

¶ 63    I write separately because I agree with the contention of defendant, Cheryl L. Plemmons, that we should not review her constitutional vagueness challenge to the second degree assault statute by determining whether it is unconstitutional beyond a reasonable doubt both on its face and as applied.  However, because we are bound by decisions of the Colorado Supreme Court holding that that standard applies, I concur with the majority.  As the majority notes, Plemmons challenges two of her three convictions for spitting at a police officer, in violation of section 18-3-203(1)(h), C.R.S. 2020.

¶ 64    I write separately to urge the supreme court to reconsider its longstanding precedent on this subject.  As I explain below, I believe that the beyond a reasonable doubt standard is (1) inconsistent with the Framers' intent regarding the separation of powers; (2) not followed by the United States Supreme Court; and (3) illogical.  Although the beyond a reasonable doubt standard is often cited by Colorado's appellate courts as black letter law, it is rarely discussed or applied, and, in my view, not applying that standard here should

lead to the vacation of Plemmons's two felony convictions under section 18-3-203(1)(h).

¶ 65 I will first address the history of the beyond a reasonable doubt standard in Colorado and the United States Supreme Court. Then, I will discuss two Colorado cases that have considered whether Colorado courts should continue to apply this standard. Next, I will explain my concerns with the standard. Finally, I will analyze why not using the beyond a reasonable doubt standard in this case should lead to the conclusions that the above-cited statute is unconstitutionally vague and that Plemmons's two convictions under that statute should be vacated.

¶ 66 The majority applies the beyond a reasonable doubt standard to Plemmons's challenge to the constitutionality of the second degree assault statute both on its face and as applied. I will likewise assume this standard applies to Plemmons's constitutional challenges both facially and as applied.

I. History of Beyond a Reasonable Doubt Standard

¶ 67 In *Alexander v. People*, 7 Colo. 155, 2 P. 894 (1884), the Colorado Supreme Court held that a state statute had to be found unconstitutional beyond a reasonable doubt in assessing whether it

violated the Colorado Constitution. This decision changed the standard from that applied four years earlier in *People v. Rucker*, 5 Colo. 455 (1880), in which the supreme court held there was a presumption that every statute is rational and "such presumption is not to be overcome unless the contrary is clearly demonstrated." *Id.* at 458-59 (citation omitted). Twelve years after *Alexander* was decided, the supreme court extended its reach to assessments of the constitutionality of statutes under the Federal Constitution. *Farmers' Indep. Ditch Co. v. Agric. Ditch Co.*, 22 Colo. 513, 528-29, 45 P. 444, 450 (1896).

¶ 68 The supreme court and the court of appeals continue to apply that standard today. *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, 2020 CO 66, ¶ 30, 467 P.3d 314, 323; *Welch v. Colo. State Plumbing Bd.*, 2020 COA 130 ¶ 15, 474 P.3d 236, 240.

¶ 69 Although the Supreme Court's landmark decision in *Marbury v. Madison*, 5 U.S. 137 (1803), established a right to judicial review of the constitutionality of a statute, it did not require a finding of unconstitutionality be established beyond a reasonable doubt. Twenty-four years later, however, the Supreme Court established the beyond a reasonable doubt standard in *Ogden v. Saunders*, 25

U.S. 213, 270 (1827). Professor James B. Thayer of Harvard Law School encouraged this interpretation in his well-known law review article, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 Harv. L. Rev. 129 (1893). *See also Adkins v. Child.'s Hosp. of D.C.*, 261 U.S. 525, 544 (1923) (statute must be proved unconstitutional "beyond rational doubt").

¶ 70    Four years after *Adkins* was decided, the United States Supreme Court abandoned the beyond a reasonable doubt standard. In *Blodgett v. Holden*, 275 U.S. 142 (1927), the Supreme Court simply held a statute invalid because it was arbitrary and violated the plaintiff's right to due process. In paying homage to the notion of judicial deference to legislative enactments, the court noted that resolving a constitutional challenge to a statute is the gravest and most delicate duty that a court is called on to perform.

¶ 71    Since 1927, the United States Supreme Court has addressed the constitutionality of statutes without applying a beyond a reasonable doubt test. *See, e.g., Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. ___, ___, 140 S. Ct. 1959, 1963 (2020); *see also* Laura J. Gibson, *Beyond a Reasonable Doubt: Colorado's*

*Standard for Reviewing a Statute's Constitutionality*, 23 Colo. Law. 835 (Apr. 1994).

¶ 72    Thus, for the past ninety-four years, the United States Supreme Court and the Colorado Supreme Court have applied different standards to assess whether a statute is constitutional.  In recent years, two Colorado appellate cases have addressed this discrepancy.

¶ 73    First, in *United Air Lines, Inc. v. City & County of Denver*, 973 P.2d 647, 655 (Colo. App. 1998) (Briggs, J., specially concurring), *aff'd on other grounds*, 992 P.2d 41 (Colo. 2000), my former colleague Steve Briggs presented a thorough, erudite analysis expressing his concerns about using the beyond a reasonable doubt standard for determining the constitutionality of a statute.  Among other things, he noted: (1) this standard establishes an extreme, unwarranted degree of deference to the legislature; (2) it creates different burdens of persuasion in state and federal courts to those challenging the constitutionality of a statute; (3) the standard has not been expressly applied in addressing the constitutionality of a statute, and divided court decisions suggest that courts have not actually applied the beyond a reasonable doubt standard; (4) the

burden of proof in a criminal case — beyond a reasonable doubt — is factual, while the determination of a statute's constitutionality using the same language is purely legal; and (5) the beyond a reasonable doubt standard in constitutional challenges is "typically recited and ignored . . . it appears as no more than a thinly-veiled rationalization." *Id.* at 658.

¶ 74 Judge Briggs acknowledged that the parties had not raised the issue in United's challenge to the constitutionality of a Denver use tax ordinance, and the beyond a reasonable doubt standard did not impact the majority's result. Similarly, in affirming the division's decision, the supreme court did not address the beyond a reasonable doubt standard of assessing constitutionality.

¶ 75 More recently, in *TABOR Foundation v. Regional Transportation District*, 2016 COA 102, 417 P.3d 850, *aff'd*, 2018 CO 29, 416 P.3d 101, a division of this court rejected the TABOR Foundation's challenge to the constitutionality of a state statute, concluding that it was obligated to follow supreme court precedent employing the beyond a reasonable doubt standard. Further analyzing supreme court case law, the division concluded that "to hold a statute unconstitutional beyond a reasonable doubt, the constitutional flaw

must be so clear that the court can act without reservation." *Id.* at ¶ 37, 417 P.3d at 858.

¶ 76 Although the Colorado Supreme Court granted the Foundation's petition for a writ of certiorari on this issue, it declined to address it, concluding that the challenged statute was constitutional with or without application of the beyond a reasonable doubt standard. *See TABOR Found. v. Reg'l Transp. Dist.*, 2018 CO 29, ¶¶ 11-12, 416 P.3d 101, 103-04.

II. Concerns Regarding the Unconstitutionality of Beyond a Reasonable Doubt Standard

¶ 77 As noted, I have three concerns about the continued use of the beyond a reasonable doubt standard. First, in my view, it misapprehends the Framers' understanding of the separation of powers. Before the Constitution was ratified, Alexander Hamilton wrote in Federalist 78 that "[t]he interpretation of the laws is the proper and peculiar province of the courts." In recognizing the power of judicial review, Federalist 78 presaged the holding in *Marbury v. Madison.* Significantly, neither Federalist 78 nor *Marbury* set forth a standard of finding a statute unconstitutional beyond a reasonable doubt. Consequently, the earlier decisions of

39

the Supreme Court and the continuing decisions of Colorado's appellate courts have followed a standard of extreme judicial deference that is not consistent with the Framers' intent.

¶ 78    Second, as noted above, the Supreme Court has not followed the beyond a reasonable doubt test since it decided *Blodgett* in 1927. Therefore, state court litigants have a higher burden of proof when challenging the constitutionality of a state statute than do federal court litigants raising the same constitutional challenge. There is no principled or practical reason to continue the use of these disparate standards.

¶ 79    Third, at least theoretically, the beyond a reasonable doubt standard permits courts to conclude that a statute is constitutional when they would otherwise reach the opposite conclusion. *See Island County v. State*, 955 P.2d 377, 391 (Wash. 1998) (Sanders, J., concurring) ("For, quite literally, the maxim requires us to hold either a statute is proved unconstitutional beyond a reasonable doubt, or we must . . . hold [that the statute] is constitutional even if it really isn't."). Perhaps, for that reason, Colorado's appellate courts often recite the beyond a reasonable doubt standard without ever applying it.

### III. Application of the Beyond a Reasonable Doubt Constitutionality Test in This Case

¶ 80     While the above might lead one to conclude that the beyond a reasonable doubt constitutionality test is mere surplusage and at most harmless, I believe that not applying that test here should lead to the conclusion that Plemmons's two second degree assault convictions should be vacated.  Let me explain why.

¶ 81     As the majority opinion observes, subsection (1)(h) provides that a person commits second degree assault if he or she spits on a police officer with the intent "to infect, injure, or harm."  Plemmons asserts that this statute is unconstitutionally vague on its face and as applied to her because the meaning of "harm" is subject to different interpretations.

¶ 82     After reiterating that we must address Plemmons's vagueness challenge under the beyond a reasonable doubt standard, the majority recites the familiar black letter rule that the essential inquiry in a void for vagueness challenge is whether "the statute 'forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess as to its

41

meaning and differ as to its application.'" *Supra* ¶ 10 (quoting *People v. Gross*, 830 P.2d 933, 937 (Colo. 1992)).

¶ 83    The majority explains that a statute must be reasonably definite to give fair warning of proscribed conduct so that people may guide their actions accordingly. The void for vagueness doctrine also ensures that a statute is sufficiently specific so that police officers "can avoid arbitrary and discriminatory application." *Supra* ¶ 10 (quoting *People in Interest of L.C.*, 2017 COA 82, ¶ 8, ___ P.3d ___, ___).

¶ 84    This latter purpose might not meet constitutional muster here if the supreme court were to abandon the beyond a reasonable doubt standard.[1] This is so for two reasons: (1) the meaning of "harm" in the phrase "infect, injure, or harm" is unclear, as evidenced by the interpretation given to the term by the trial court and the majority's resort to legislative history to define what it concludes is an ambiguous term; and (2) no clear distinction exists

---

[1] The former purpose — giving fair warning of proscribed conduct so that people may guide their actions accordingly — is not really at play here. It would be reasonable to conclude that spitting at a police officer would subject a person to some type of criminal liability.

between "harm" in the second degree assault statute and the phrase "harass, annoy, threaten, or alarm" in the third degree assault statute, section 18-3-204(1)(b), (3), C.R.S. 2020, which describes a misdemeanor.

¶ 85 Because each term in a statute is to be given meaning, *Young v. Brighton Sch. Dist. 27J*, 2014 CO 32, ¶ 25, 325 P.3d 571, 579, and the definition of "harm" overlaps with the definition of "injure," the trial court determined that "harm" must mean psychological or emotional harm. Of course, this post hoc definition of "harm" did not avoid arbitrary or discriminatory enforcement, because it arose after Plemmons was charged with second degree assault. Indeed, the prosecutor argued in the trial court that "harm" referred to bodily injury, a definition rejected by the trial court. Consequently, Plemmons was charged with committing second degree assault based on a definition of "harm" that was apparently not envisioned by the prosecution.

¶ 86 The prejudice to Plemmons from this post hoc definition of "harm" is clear based on what actually transpired during Plemmons's trial. Both police officers testified that Plemmons spit on them, but neither testified that he had experienced any

43

psychological or emotional harm from the spitting. Rather, one officer simply testified that he washed his face shortly after the officers took Plemmons to the hospital. Accordingly, the prosecution did not present any evidence that Plemmons's spitting caused the police officers psychological or emotional harm.

¶ 87  Further, the risk of discriminatory and arbitrary enforcement of the second degree assault statute is clear from the majority's acknowledgment that the term "harm" is ambiguous and its resort to legislative history to define the term. In a thorough, well-reasoned exploration of the legislative history, the majority agrees with the trial court that the term "harm" refers to psychological or emotional trauma. That analysis makes sense, but it doesn't adequately address the question of whether this definition of "harm" precludes discriminatory or arbitrary enforcement when the plain language of the statute doesn't make this distinction.

¶ 88  I recognize that any "ambiguity alone does not make a statute unconstitutionally vague." *People in Interest of M.C.*, 2012 COA 64, ¶ 28, 292 P.3d 1030, 1037. However, if we consider whether a statute is unconstitutional beyond a reasonable doubt, analysis of the legislative history may well lead to the conclusion that the

statute is not so "vague, indefinite, and uncertain" that courts are unable to determine the legislature's intent. *Bd. of Cnty. Comm'rs v. City & Cnty. of Denver*, 194 Colo. 252, 257, 571 P.2d 1094, 1097 (1977) (citation omitted). On the other hand, if we presume that the second degree assault statute is constitutional, but do not consider its unconstitutionality beyond a reasonable doubt, I would conclude that the second degree assault statute is unconstitutionally vague. I would reach this conclusion because, absent the legislative history, one could not reasonably conclude what conduct the second degree assault statute was intended to punish.

¶ 89 Even under the definition of "harm" employed by the trial court and the majority, it is not clear that the two police officers on whom Plemmons spit actually suffered any psychological or emotional trauma. As noted, the police officers on whom Plemmons spit did not testify that they had suffered any such trauma.

¶ 90 In any event, under the definition of "harm" used by the trial court and the majority, there remains an unreasonable risk of a defendant being charged with second degree assault, rather than third degree assault. Given Plemmons's spitting at the police officers in her home, it seems clear that she could easily have been

charged with third degree assault for harassing, annoying, threatening, or alarming the police officers instead of second degree assault for causing them psychological or emotional harm. Absent evidence of psychological or emotional harm, it would nevertheless be easy for prosecutors to charge a defendant with second, rather than third, degree assault for conduct directed at police officers, as was the case here.

¶ 91 It is one thing to say, as some legislators apparently did, that spitting on the boots of a police officer is not as blameworthy as spitting in a police officer's face. While that distinction make sense, it is not at all the distinction made in the second and third degree assault statutes.

¶ 92 Accordingly, I urge the Colorado Supreme Court to reconsider its longstanding precedent applying the beyond a reasonable doubt unconstitutionality test and then determine whether the second degree assault statute's definition of "harm" makes it unconstitutionally vague.